**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 98-20441

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

AL RICHARDS, KURT LATRASSE, AND ROGER BRAUGH,

Defendants-Appellants.

Appeal from the United States District Court
for the Southern District of Texas

February 9, 2000

Before KING, Chief Judge, and STEWART, Circuit Judge, and
ROSENTHAL, District Judge.[1]

Defendants appeal their convictions for their involvement in
a purported investment scheme that took large sums of money from
the investors and returned them little or nothing. The investors
believed that their money went to purchase letters of credit, which
defendants were to "roll," or repeatedly sell and repurchase, to
European banks. The indictment alleged that the defendants took

---

[1]    District Judge of the Southern District of Texas,
sitting by designation.

1

the money from the investors, but purchased no letters of credit and instead kept the money for themselves.

Al Richards appeals his convictions for conspiracy to commit wire and mail fraud, in violation of 18 U.S.C. § 371; interstate transportation of stolen property, in violation of 18 U.S.C. § 2314; and wire fraud, in violation of 18 U.S.C. § 1343. Richards also appeals the district court's order that he pay restitution in the amount of $487,000. Roger Braugh and Kurt Latrasse appeal their convictions for conspiracy to commit wire fraud and mail fraud; interstate transportation of stolen property; wire fraud; and mail fraud, in violation of 18 U.S.C. § 1341. Braugh also appeals the district court's order that he pay $504,500 in restitution. Finding ample evidence in the record to support the convictions and no basis for reversal, we affirm.

## I.    BACKGROUND AND PROCEDURAL HISTORY

The superseding indictment charged all three defendants with conspiracy to commit mail and wire fraud (count 1), interstate transportation of stolen property (count 2); and wire fraud (count 3). The indictment charged Braugh and Latrasse with two additional counts of wire fraud (counts 4 and 5) and one count of mail fraud (count 6). The jury convicted Richards on all three counts and convicted Braugh and Latrasse on all six counts.

At trial, the government presented evidence as to how defendants induced participants to "invest" in the so-called roll program. Potential investors were told that their money would be pooled with that of other investors and used to buy letters of credit. The letters of credit would be "rolled" — sold,

2

repurchased, and resold — to European banks frequently and repeatedly. Each "roll" would generate a large profit to be distributed among the investors, in proportion to their investment. The investors were told that their funds would be safe at all times, held either in an account at a nationally-known brokerage firm or invested with a "prime" or "top 50" international bank. Investors were also told that they would receive at least the return of their initial investment, with interest, and would likely make substantial profit. In fact, the defendants took the invested funds for their own use, bought no letters of credit, and, except for a small payment to one participant, returned no money to the investors.

Three investors testified. Bert Hayes, an Arkansas businessman, was introduced to the program by Al Richards in a telephone call. Richards outlined an investment opportunity, but refused to discuss the details until Hayes signed a noncircumvention, nondisclosure agreement. After Hayes signed the agreement, Richards suggested they meet in Dallas to discuss the potential investment. Hayes agreed.

At the Dallas meeting, Richards told Hayes that in the "roll program," the investors' funds would be pooled to buy a $10 million letter of credit from a "top 50 prime bank." The letter of credit would be "rolled" to different European banks. The investors would earn interest with each "roll." Richards told Hayes that the interest on the "rolls" would generate ten weekly payments of $50,000 each on a $ 250,000 investment. Richards told Hayes that his money would be kept in an interest-bearing account at the

3

Shearson Lehman Brothers brokerage firm until used to buy the letter of credit. Richards assured Hayes that he would control the money until all the other funds necessary for the roll program were raised. If the roll program could not purchase a letter of credit, Richards would return Hayes's original investment, with ten percent interest.

Richards explained that he would not personally be involved in purchasing and selling the letters of credit. His "contacts," identified as Roger Braugh and Al Sellars, would handle the roll program transactions.

Hayes signed a written contract in August 1991. The contract identified Hayes and Gold Cloud Development Corporation as the parties to a "joint business proposition." The contract was signed by Hayes and by "Roger S. Braugh by Al Richards" as the chairperson of Gold Cloud Development.

The contract provided that Hayes would deposit his investment funds in a designated brokerage firm account on September 5, 1991. On the Monday following that date, Gold Cloud Development would purchase a "One Year Zero Interest Coupon Standby Letter of Credit with a $10,000,000.00 USD face value." Gold Cloud Development would "orchestrate the sale of the Standby Letter of Credit in the European or Japanese secondary markets based on an already existing contractual arrangement . . . ." Gold Cloud Development would wire Hayes his share of the profits from that sale, expected to be $50,000, to a bank Hayes would designate. "The original $ 10 Million USD principal would be reinvested on Monday each week for the purchase of a new Standby Letter of Credit to repeat the same

4

weekly chain of events, for a period of no less than ten (10) transactions."

On September 6, 1991, Hayes sent a $ 250,000 check to a designated Shearson Lehman Brothers account for investment in the Gold Cloud Development roll program. On the same day, Richards signed and sent Hayes a "Business Proposal on Funding Commitment." This document set out Al Richards' plan to use GEI Associates, a company Richards owned and ran, to raise $10 million to buy the first letter of credit. The business proposal provided that if GEI Associates could not raise the money necessary to buy the first letter of credit, Hayes would receive his money back, with interest.

When Hayes sent in his $250,000 check, he told Richards he wanted to meet the individuals who would be handling the roll transactions. Richards arranged a meeting with Hayes and Roger Braugh and Al Sellars a few weeks later. At that meeting, Hayes asked Al Sellars if the investment was safe. Sellars, noting that Hayes was wearing a Mason pin, told Hayes that he was also a Mason and that the investment was "as safe as the Rock of Gibraltar." Sellars asked Braugh to "roll" the investment at least twice in the next week so that Hayes could see how the program worked.

After that meeting, Hayes understood Braugh to be in control of the roll program transactions. Hayes expected to be paid within a few weeks for the first roll transaction, set to occur the following week. Several weeks passed with no payments. Hayes began to question both Richards and Braugh about the program and about his money. In December 1991, Richard told Hayes that the

initial arrangement was not working and proposed a different arrangement. Richards proposed to change the payment plan from ten weekly payments of $50,000 each to 42 weekly payments of $ 20,000 each. Hayes agreed and signed a revised contract. "Roger S. Braugh by Al Richards" signed as the chairperson of Gold Cloud Development.

Early in 1992, Braugh introduced Hayes to Kurt Latrasse. Braugh identified Latrasse as an expert in the roll program. Latrasse told Hayes that his money was invested in England and "doing very well." In June 1992, Latrasse advised Hayes to cancel his contract with Richards and GEI Associates so that Hayes could deal directly with Braugh and Latrasse and avoid paying commissions to Richards. Hayes followed Latrasse's advice and, by letter to Richards dated June 12, 1992, canceled the contract with Richards and GEI Associates.

In August 1992, Hayes complained to Braugh that he still had not received any payments from his investment. Braugh expressed surprise and explained that he had sent Richards several checks intended for distribution to Hayes. Braugh sent Hayes photocopies of seven canceled checks, totaling $50,000, signed by Braugh and made out to Richards. The notation "Bert Hayes payment" appeared on the memorandum line of each check. Hayes telephoned Richards to ask why he had not sent Hayes the $50,000. Richards expressed surprise; he insisted that the checks were his own commissions, not Hayes's investment returns. Richards accused Braugh of lying to Hayes. During this time, Braugh sent Hayes a $15,000 check so that

Hayes could pay the interest due on the loan he had taken out to fund his $ 250,000 investment in the roll program.

In September 1992, Hayes sent a fax message to Latrasse asking for an accounting and a status report on the investment. Hayes received no response. A few weeks later, Hayes sent Latrasse a second fax, again asking for an accounting. On October 5, 1992, Latrasse sent a fax, announcing that Gold Cloud Development had been able to purchase "the commitments" for the roll program in late November 1991. Latrasse continued:

> Now, as to the future, we believe we will be able to return the original investment plus a reasonable return to you within this month. We would propose at that time to invest the net proceeds (after principal and interest on your loan has been satisfied) in a master collateral commitment. . . . [I]nasmuch as you have been patient as Job with us, we would like to include you as an equal participant in whatever profits are generated.

The month passed; Hayes received no money.

Hayes sent several more fax messages to Latrasse over the next few months, to no avail. By May 1993, neither Latrasse nor Braugh was returning Hayes's telephone calls or faxed messages. Hayes heard nothing further about the program until 1996, when the FBI contacted him. Hayes lost $235,000.

Gail Schwinger, another investor, also testified at trial. Schwinger met Richards in November 1991 through her partners in an investment company. After Schwinger and her partners signed a noncircumvention, nondisclosure agreement, Richards revealed the mechanics of the roll program. Richards gave Schwinger much the same explanation he had given Hayes, with one variation. Richards

7

told Schwinger that an investment of $250,000 could earn up to $40,000 per week for 42 weeks, not the $50,000 per week for ten weeks he initially described to Hayes.

In December 1991, Schwinger and her partners met with Richards, Braugh, and Sellars in Houston. When Schwinger questioned whether her money would be safe, Braugh assured her that her money would never leave the banks and would be very safe. Schwinger agreed to invest $ 250,000 and, on December 11, 1991, signed a contract with Gold Cloud Development. "Roger Braugh by Al Richards" signed the contract as the chairperson of Gold Cloud Development. The contract stated that the letters of credit would be rolled 42 times; Schwinger would receive $40,000 for each roll. The contract provided that if Gold Cloud Development could not buy a letter of credit, Schwinger would receive her full investment back with interest. Schwinger sent a $250,000 check for deposit in the designated Shearson Lehman Brothers account on the same day she signed the contract.

After the expected date for the first payment passed, one of Schwinger's partners began asking Richards questions about the investment. In January 1992, Schwinger asked Braugh for a status report. Braugh told her that the program had been delayed. In February 1992, Braugh told Schwinger that Kurt Latrasse had taken over the roll program. In later conversations, Braugh gave Schwinger different excuses for the lack of payments. In separate conversations, he told her that Latrasse was in the hospital with gallstones; that Latrasse's wife was in the hospital for dental surgery; and that Latrasse might have cancer. According to Braugh,

8

these problems prevented Latrasse from traveling to Europe to correct problems with the roll program.

Schwinger also spoke to Richards and Braugh several times in February and March of 1992. Each time, Schwinger received excuses or promises that quickly proved false. In March 1992, Braugh tried to persuade Schwinger to invest in another roll program. Schwinger agreed to attend a meeting in April 1992 to discuss the proposed investment with Braugh, Al Sellars, and a man named Harold Sellers, identified as Al Sellars' attorney. Schwinger had no intention of participating in another program, but agreed to the meeting so she could ask questions about her original $250,000 investment. Schwinger received no answers at the meeting.

After the March 1992 meeting, Schwinger hired an attorney, who sent a letter to Richards, Braugh, and Latrasse demanding an accounting. On May 28, 1992, Latrasse called Schwinger and told her that he was upset that she had hired a lawyer. The next day, Schwinger sent a fax to Latrasse, again asking for an accounting. Latrasse agreed. On June 11, 1992, Schwinger sent Latrasse another fax asking when she would receive the promised accounting. On June 19, Latrasse responded by offering another excuse for the delays and promising prompt payment: "The commitments for collateral and funding have now been conformed and are working properly. We anticipate distribution of accumulated earnings to commence by or on – by or before June 30th."

June 30, 1992 came without either payment or an accounting. On that date, one of Schwinger's partners wrote to Latrasse, Braugh, and Sellars, stating that he planned to contact

9

federal and state authorities about the investment program. Latrasse left two messages on Schwinger's answering machine on July 1, 1992. In the first message, Latrasse told Schwinger that there had been movement on the account and proposed a meeting to discuss the investment. In the second message, Latrasse said he had received the "threatening" letter from Schwinger's partner and proposed a meeting before attorneys became involved. One of Schwinger's partners did arrange a meeting with Latrasse and Schwinger. Latrasse did not appear. Schwinger never recovered any of her investment.

Brandon Blackwelder was the third investor to testify at trial. Blackwelder met Roger Braugh in 1993. Braugh described his career field as "international finance" and asked if Blackwelder would be interested in investing in a "deal" in Europe. Braugh told Blackwelder that the investment was secret and available only to "blue-bloods" and "high-ranking officials." Braugh described the investment as a "roll-over program" consisting of purchases and sales of prime bank instruments in Europe. Blackwelder agreed to invest $12,500.

On May 12, 1993, Braugh went to Blackwelder's office to collect the money. While there, Braugh telephoned Kurt Latrasse. Using a speaker phone, Braugh asked Latrasse to allow Blackwelder to invest only $12,500 instead of what Braugh described as the minimum amount of $25,000. Latrasse responded that Blackwelder could invest the lower amount if Blackwelder would agree to recruit other investors for the program.

10

Blackwelder and Braugh signed a contract titled the "SAI Opportunity Account Agreement" that same day. Braugh signed the contract on behalf of "SAI & Associates." The contract provided that SAI & Associates would "guarantee that the capital account shall be returned at the end of ninety (90) days from the date of execution of this Agreement." The initial term of 90 days would be deemed renewed absent a written notice of nonrenewal by either party. Braugh also signed a instrument styled an "Unsecured Note," in which he promised to pay Blackwelder, within the 90-day initial term, the principal amount with interest at a twenty percent annual rate.

Blackwelder spoke to Braugh or Latrasse several times after he made the investment. On June 26, 1993, Blackwelder hand-delivered Braugh a letter stating that Blackwelder did not wish to renew the contract after the initial 90-day term. Blackwelder explained that he needed the money for a down payment on a new house. After this meeting, Blackwelder was unable to reach Braugh for weeks. When Blackwelder finally talked to Braugh, Braugh provided excuses, but no money.

In July 1993, Braugh called Blackwelder. Braugh explained that if he could travel to Europe, he could expedite the roll program transactions, but he needed $5,000 to $10,000 to make the trip. Braugh asked Blackwelder to lend him the money. Blackwelder agreed to lend Braugh $5,000, but asked Braugh to give him a post-dated repayment check as security. On July 8, 1993, Blackwelder gave Braugh two checks for $2,500 each. In return, Braugh gave Blackwelder a check in the amount of $5,000, post-dated July 16,

11

1993. Braugh cashed the checks from Blackwelder, but did not use the money to pay for a trip to Europe.

On July 16, 1993, Blackwelder told Braugh that he planned to cash the repayment check. Braugh told Blackwelder that he had not yet deposited money in the account on which the check was drawn. Blackwelder nonetheless presented the check for payment, which, predictably, bounced. Blackwelder tried unsuccessfully to recover his money from Braugh. On November 22, 1993, Braugh wrote Blackwelder a letter stating that he would repay Blackwelder's $5,000 loan with cash or a cashier's check. Blackwelder received no repayment.

Blackwelder also spoke with Latrasse several times about his investment. Latrasse repeatedly told Blackwelder that there would be action on his investment "any day." In February 1994, Latrasse sent Blackwelder a fax stating that Latrasse had designated a disinterested third party to deliver Blackwelder a check returning his investment. Blackwelder never received the check. He lost his $12,500 investment and the $5,000 loan.

Kathryn Brewer, a financial analyst with the FBI, examined numerous bank and brokerage account records to trace the funds Hayes, Schwinger, and Blackwelder invested. She testified that most of the money was distributed among bank accounts of the three defendants. The remaining funds were disbursed to various entities unrelated to any investment program.

Hayes's $250,000 check was initially deposited into a Shearson Lehman Brothers account in Braugh's name on September 6, 1991. All but approximately $1,000 of this money was transferred out of that

12

account within one month of the deposit. From September 11, 1991 and ending to October 4, 1991, $182,500 was wire-transferred from Braugh's Shearson Lehman Brothers account to an account in Braugh's name at the Bank of Corpus Christi. A $100,000 check to Al Sellars was drawn on Braugh's Bank of Corpus Christi account on September 11, 1991. From September 11, 1991 to September 27, 1991, a total of $24,000 was wire-transferred from Braugh's Bank of Corpus Christi account to an account at the same bank in the name of Lone Star Exploration.[2] On October 3, 1991, $25,000 was transferred directly from Braugh's Shearson Lehman Brothers account to the Lone Star Exploration bank account. Nearly all the $49,000 deposited in the Lone Star Exploration account was disbursed to various entities unrelated to any roll program.[3]

Brewer testified that a $32,000 cashier's check made payable to Al Sellars was purchased on September 20, 1991 with money from Braugh's Bank of Corpus Christi account. The check was ultimately redeposited into Braugh's Shearson Lehman Brothers account. Brewer testified that two wire transfers — a September 17, 1991 transfer in the amount of $7,500 and a September 25, 1991 transfer in the

---

[2]     The signature card for the Lone Star Exploration account disclosed that the account was opened on September 11, 1991, five days after Hayes delivered his check. Braugh and a man named Jerry Fritzler were the only authorized signatories. The signature card identified Braugh as the chairman of Lone Star Exploration and Fritzler as the president.

[3]     The bank records showed that checks made payable to Watson Pipe, Inc.; Clark Oil Tools; Halliburton Services; Pride Petroleum; Cellular One; and Southwestern Bell were drawn on the Lone Star Exploration account.

amount of $5,000 — were made from Braugh's Bank of Corpus Christi account to an account in the name of Kurt Latrasse in California.

Schwinger deposited her $250,000 check into the Shearson Lehman Brothers account in the name of Gold Cloud Development on December 12, 1991. Brewer testified that, on December 13, 1991, two checks made payable to Roger Braugh, totaling $50,000, were drawn on the Gold Cloud Development account. By January 3, 1992, $198,500 was transferred from the Gold Cloud Development account to Roger Braugh's Shearson Lehman Brothers account. Seven checks made payable to either Al Richards or GEI Associates, totaling $50,000, were later drawn on Braugh's Shearson Lehman Brothers account; two checks made payable to Kurt Latrasse, totaling $59,500, were drawn on this same account in late December 1991. Three wire transfers totaling $46,000 were made to Roger Braugh's account at the Bank of Corpus Christi in December 1991. The records from Braugh's Bank of Corpus Christi account also showed transfers totaling $22,000 to the Lone Star Exploration account at that bank in December 1991; the remaining money was disbursed to entities unrelated to any roll program.

Blackwelder wrote a $12,500 check payable to SAI & Associates on May 12, 1993. The check was deposited into the account of SAI & Associates at the Bank of America on the same day. On that same date, a $5,000 check made payable to Kurt Latrasse was drawn on the SAI & Associates account and $2,500 was transferred from the SAI & Associates account to an account in the name of Roger Braugh at the Bank of America. Another $1,400 was transferred from the SAI & Associates account to Braugh's account on May 24, 1993. The money

14

transferred to Braugh's personal account was in turn disbursed to various entities unrelated to any investment program. Brewer's analysis showed that Braugh paid various expenses with the $5,000 Blackwelder loaned him, writing checks to, among other entities, General Motors Acceptance Corporation and Wal-Mart. Braugh did not use the money to pay for a trip to Europe, as he had promised Blackwelder.

On January 20, 1998, a jury convicted Richards, Braugh, and Latrasse on all counts. On May 14, 1998, the district court sentenced each defendant to thirty-three months of imprisonment followed by three years of supervised release. The district court ordered Richards to pay $487,000 in restitution and ordered Braugh and Latrasse each $504,500 in restitution. The district court entered judgment on May 19, 1998. Defendants timely appealed.

## II. THE CHALLENGE TO THE INDICTMENT

Braugh argues for the first time on appeal that the superseding indictment did not meet constitutional standards. He relies on the recent decision of United States v. Neder, 527 U.S. 1, 119 S. Ct. 1827 (1999), holding that the "materiality of falsehood is an element of the federal mail fraud [and] wire fraud . . . statutes." Id. at 1841. Braugh contends that because the indictment did not specifically allege that the misrepresentations he made were material, it failed to allege an essential element of wire fraud and mail fraud.

"To be sufficient, an indictment must allege every element of the crime charged." United States v. Fitzgerald, 89 F.3d 218, 221 (5th Cir. 1996). A challenge to the sufficiency of the indictment

15

is reviewed de novo.  See United States v. Cabrera-Teran, 168 F.3d 141, 143 (5th Cir. 1999).  "An indictment's failure to charge an offense is a jurisdictional defect."  Id.  Because the sufficiency of an indictment is  a prerequisite to jurisdiction, a "defendant[] at any time may raise an objection based on failure to charge an offense."  Id.  However, when a challenge to the sufficiency of the indictment is made for the first time on appeal, "a court should read the indictment with 'maximum liberality' and find it sufficient 'unless it is so defective that by any reasonable construction, it fails to charge the offense for which the defendant is convicted.'"  United States v. Lankford, 196 F.3d 563, 569 (5th Cir. 1999)(quoting Fitzgerald, 89 F.3d 218, 221 (5th Cir. 1996)).  "Maximum liberality" is the appropriate standard of review when, as here, "the appellant does not assert prejudice, that is, [when the appellant] had notice of the crime of which he stood accused."  Fitzgerald, 89 F.3d at 221; see also Lankford, 196 F.3d at 569.

In determining the sufficiency of the indictment, "[t]he law does not compel a ritual of words."  United States v. Wilson, 884 F.2d 174, 179 (5th Cir.  1989)(quoting United States v. Purvis, 580 F.2d 853, 857–858 (5th Cir. 1978).  "The test of the validity of an indictment is 'not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards.'"  Wilson, 884 F.2d at 179(quoting United States v. Webb, 747 F.2d 278, 284 (5th Cir. 1984)).

In Neder, the Court defined "materiality of falsehood" in a footnote:

16

> The Restatement instructs that a matter is material if: "(a) a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question; or
> (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it."

Neder, 119 S. Ct. at 1840 n. 5(quoting *Restatement (Second) of Torts* § 538 (1976)).[4]  This court applies this definition to determine whether, by any reasonable construction, the superseding indictment charged Braugh with making materially false representations.

In United States v. McCough, 510 F.2d 598 (5th Cir. 1975), this court considered a similar challenge to an indictment.  In that case, the indictment charged a violation of 18 U.S.C. § 1001, which prohibits the making of false statements to a department or agency of the United States.  The indictment in McCough alleged that a utility cooperative had submitted false financial statements to a federal agency in a loan application.  The defendants argued that the indictment insufficiently alleged the materiality of the falsehoods under section 1001.  The court stated that "[i]f the facts alleged in the indictment warrant an inference that the false

---

[4]     The definition of materiality quoted above refers to the statements themselves, not whether the recipients of the statements actually relied on them.  Although allegations of actual reliance appear to allege materiality, the standards are different.  A recipient might actually rely on a false representation, but the representation might not be one to which "a reasonable man would attach importance . . . in determining his choice of action," or one that "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it."  Neder, 119 S. Ct at 1840 n. 5.

17

statement is material, the indictment is not fatally insufficient for its failure to allege materiality in haec verba." Id. at 602; see also United States v. Fern, 155 F.3d 1318, 1324 (11th Cir. 1998); United States v. Pommerening, 500 F.2d 92, 98 (10th Cir. 1974); United States v. Olin Corp., 465 F. Supp. 1120, 1131–32 (W.D.N.Y. 1979).

The McCough indictment alleged that the financial statements substantially misstated the value of the cooperative's assets and described specific entries in the financial statements that contained misrepresentations. The court held that the indictment sufficiently alleged the materiality of the false financial statements because it alleged specific misstatements that were significant and "could conceivably have the capacity to influence the [agency's] function in overseeing the status of the security of a large public investment." Id. at 603.

The superseding indictment in this case alleged false representations of specific facts that also "warrant an inference that the false statement[s] [were] material." Id. at 602. The indictment detailed the specific false representations and promises defendants allegedly made to "induce the Investors to deliver to the Defendants cashier's check and checks." Paragraph Six of Count One of the indictment alleged:

> ROGER S. BRAUGH, AL RICHARDS, and KURT LATRASSE would and did represent falsely to certain individuals, including but not limited to Bert Hayes, Gail Schwinger, and Brandon Blackwelder (the "Investors"), that they had contacts with European banks and lenders and that the Investors would receive a substantial return on an investment involving transactions between banks within a matter of weeks or months.

18

Paragraph Ten of Count One of the indictment alleged:

> ROGER S. BRAUGH, AL RICHARDS, and KURT LATRASSE would and did continue to send and receive communications . . . to and from the Investors, even after the Investors had delivered their money to the defendants, for the purpose of lulling the Investors into a false sense of security by assurances that the promised services would be, or were being, performed, and that the investment was a worthwhile one, and that they would receive distributions, or return of it, at some future date; for the purpose of postponing inquiries, complaints, or legal action by the Investors, and lessening the suspect appearance of the fraudulent transactions; and, for the purpose of giving excuses for non-performance, thereby allowing additional investments or loans to be sought from the Investors.

Paragraph 13 of Count One of the indictment listed twenty-eight overt acts, including specific communications with the investors describing the details of the investment program and later assuring the investors that the program was making money as promised. The allegations in Paragraphs Six, Ten, and Thirteen of Count 1 are incorporated by reference in all other counts of the indictment.

The indictment in this case does not test constitutional limits in light of Neder. Read as a whole, the superseding indictment alleges specific facts that easily support an inference that the defendants made material misrepresentations and false promises. In particular, the allegations that the defendants misrepresented that the investment program existed, was free from risk of loss, and would generate large profits support an inference of materiality. A "reasonable man would attach importance" to assurances that the investments would take place as described and would return at least the invested funds, plus interest, within a short time, in determining whether to invest. The allegations in

19

the indictment are sufficient to charge the offenses of mail fraud, wire fraud, and conspiracy to commit mail fraud and wire fraud.

## III. THE CHALLENGE TO THE DENIAL OF BRAUGH'S MOTION TO SEVER

Braugh argues that the district court improperly denied his motion to sever because the evidence presented at trial was so complicated that the jury had difficulty considering the evidence against each defendant separately. Braugh also argues that the defendants presented antagonistic defenses.

The district court's denial of a motion to sever is reviewed for an abuse of discretion. See United States v. Pena-Rodriquez, 110 F.3d. 1120, 1128 (5th Cir. 1997). Rule 8(b) of the Federal Rules of Criminal Procedure provides in relevant part: "Two or more defendants may be charged in the same indictment . . . if they are alleged to have participated . . . in the same series of acts or transactions constituting an offense or offenses." Generally, "persons indicted together should be tried together, especially in conspiracy cases . . . ." United States v. Posada-Rios, 158 F.3d 832, 863 (1998), cert. denied, ___ U.S. ___, 119 S. Ct 1280 (1999), cert. denied, ___ U.S. ___, 119 S. Ct 1487 (1999), and cert. denied, ___ U.S. ___, 119 S. Ct. 1792 (1999) (quoting United States v. Pofahl, 990 F.2d 1456, 1483 (5th Cir. 1993)).

Rule 14 of the Federal Rules of Criminal Procedure authorizes the trial court to grant a severance based on a showing of prejudice. To demonstrate that a district court abused its discretion in denying a motion to sever, the defendant "must show that: (1) the joint trial prejudiced him to such an extent that the district court could not provide adequate protection; and (2) the

20

prejudice outweighed the government's interest in economy of judicial administration." United States v. McCord, 33 F.3d 1434, 1452 (5th Cir. 1994)(quoting United States v. DeVarona, 872 F.2d 114, 120-21 (5th Cir. 1989)).

This trial lasted two weeks and involved three defendants. This court has upheld a district court's decision to deny severance in cases involving many more defendants, more evidence, greater complexity, and longer trials. See, e.g., Posada-Rios, 158 F.3d at 863-65(upholding district court's denial of a motion to sever in a conspiracy case tried for six months against 12 defendants); United States v. Ellender, 947 F.2d 748, 753-755 (5th Cir. 1991)(upholding district court's denial of a motion to sever in a conspiracy case tried for three months against 23 defendants, with 73 witnesses).

A general description of the complexity of a trial is not sufficient to show the "specific and compelling prejudice" necessary for reversal of a district court's denial of a motion to sever. United States v. McCord, 33 F.3d at 1452; cf. Posada-Rios, 158 F.3d at 863. Instead, an appellant must "isolate events occurring in the course of the joint trial and then . . . demonstrate that such events caused substantial prejudice." Posada-Rios, 158 F.3d at 863(quoting Ellender, 947 F.2d 748, 755 (5th Cir. 1991)). Braugh has not identified specific events that caused prejudice and require reversal.

Braugh's argument that the jury's conviction of all defendants on all counts shows that it did not separately consider the evidence as to each defendant is unavailing. This court has stated that "acquittals as to some defendants on some counts

21

support an inference that the jury sorted through the evidence and considered each defendant and each count separately." Posada-Rios, 158 F.3d at 864 (quoting Ellender, 947 F.2d at 755). It does not necessarily follow, however, that conviction of all defendants on all counts shows that the jury failed separately to weigh the evidence as to each defendant.

"Appropriate cautionary instructions can decrease the possibility that the jury will improperly transfer proof of guilt from one defendant to another." Ellender, 947 F.2d at 755 (quoting United States v. Hogan, 763 F.2d 697, 705 (5th Cir. 1985)). "The pernicious effect of cumulation . . . is best avoided by precise instructions to the jury on the admissibility and proper uses of the evidence introduced by the Government." United States v. Morrow, 537 F.2d 120, 136 (5th Cir. 1976). In this case, the trial court gave careful instructions during the trial about the limited purpose for which it admitted some of the evidence. The court included the limiting instructions in the final instructions to the jury. In the trial instructions, the court also admonished the jury as follows:

> A separate crime is charged against one or more of the defendants in each count of the indictment. Each count, and the evidence pertaining to it, should be considered separately. Also, the case of each defendant should be considered separately and individually. The fact that you may find one or more of the defendants guilty or not guilty of any of the crimes charged should not control your verdict as to any other crime or any other defendant. You must give separate consideration to the evidence as to each defendant.

Similar instructions have been held sufficient to eliminate the possibility of undue prejudice. See Posada-Rios, 158 F.3d at 864;

22

<u>United States v. Faulkner</u>, 17 F.3d 745, 759 (5th. Cir 1994). "The remedy of severance is justified only if the prejudice flowing from a joint trial is clearly beyond the curative powers of a cautionary instruction." <u>Morrow</u>, 537 F.2d at 136. Braugh offers no specific basis for concluding that the district court's repeated and meticulous instructions failed to avoid legally cognizable prejudice.

Braugh also argues that the district court should have severed his trial because Richards presented an antagonistic defense. Braugh points to three instances of purported antagonism. First, Richards' attorney stressed in opening statements that Bert Hayes's money was deposited into an account that Braugh, not Richards, controlled. Second, Richards' attorney argued that the checks Braugh wrote to Richards with the notation "Bert Hayes payment" on the memorandum line were to pay Richards' commissions, and that Braugh lied when he told Hayes that the checks were for him. Richards' attorney argued that Braugh wrote "Bert Hayes payment" on the cashed and canceled checks after the fact. Braugh's attorney contended that Braugh sent the money to Richards in order to pay Hayes. Third, during his cross-examination of Schwinger, Richards' attorney asked questions about events that occurred after Richards' involvement had ended, including actions Braugh took to make Schwinger continue believing that the roll program was legitimate. Braugh argues that these trial tactics were intended to blame Braugh and portray Richards' involvement as innocent.

"[S]everance is not automatically required merely because co-defendants present mutually antagonistic defenses." <u>United States</u>

23

v. Castillo, 77 F.3d 1480, 1491 (5th Cir. 1996); see also United States v. Matthews, 178 F.3d 295, 298 (5th Cir.), cert. denied, ___ U.S. ___, 120 S. Ct. 359 (1999).  The decision is committed to the discretion of the trial court and will be reversed only if the defendant shows "specific and compelling prejudice" the joint trial caused his defense.  This court has held that when defendants present antagonistic defenses, "instructions to consider the evidence as to each defendant separately and individually, and not to consider comments made by counsel as substantive evidence sufficed 'to cure any prejudice caused when co-defendants accuse each other of the crime.'"  United States v. Mann, 161 F.3d 840, 863 (5th Cir. 1998)(quoting United States v. Stouffer, 986 F.2d 916, 924 (5th Cir. 1993)), cert. denied, ___ U.S. ___, 119 S. Ct. 1766 (1999).  The district court gave both these instructions in this case.

In addition to the curative instructions, a close examination of Richards' and Braugh's defenses shows that they fall short of mutual antagonism.  Defenses are antagonistic if they are "mutually exclusive or irreconcilable, that is, if the core of one defendant's defense is contradicted by that of a codefendant."  United States v. Rojas-Martinez, 968 F.2d 415, 419 (5th Cir. 1992); see also United States v. Moser, 123 F.3d 813, 829 (5th Cir. 1997).  Richards presented his belief that the roll program was legitimate as the core of his defense.  The core of Braugh's defense was that Al Sellars  masterminded the "roll program" and Braugh believed it to be legitimate.  The two defenses are not mutually antagonistic; the jury could have believed both.  Specifically, the jury could

24

have found that Braugh wrote "Bert Hayes payment" on the canceled checks after Richards cashed them, as Richards' attorney argued, and that Braugh believed the investment program was legitimate, as Braugh's attorney argued. The evidence as to Braugh's continued involvement with Schwinger's investment after Richards' participation ended similarly did not conflict with Braugh's defense that he believed the investment program to be legitimate.

Richards and Braugh did not present mutually antagonistic defenses, so as to require severance. The district court carefully instructed the jury separately to consider the evidence admitted against each defendant. Braugh has not demonstrated the "specific and compelling prejudice" necessary for reversal based on the district court's denial of his motion to sever.

## IV. THE CHALLENGES TO THE ADMISSION OF EVIDENCE

### A. THE RULE 403 OBJECTION

Richards argues that the district court abused its discretion in admitting Braugh's testimony that he brought a dispute he had with Richards to the attention of the federal and state prosecutor's offices in Fort Worth and Dallas, respectively. Richards contends that the district court should have excluded the testimony under Rule 403 of the Federal Rules of Evidence, on the ground that "its probative value is substantially outweighed by the danger of unfair prejudice."

Braugh testified without objection that Richards asked him for $30,000 in January 1992. Braugh sent Richards three $10,000 checks. Braugh testified that Richards agreed not to cash those checks, but

25

merely to show them to anxious creditors to provide assurance. Instead, Richards cashed the checks, against Braugh's instructions.

Richards did object to Braugh's testimony the following day, when Braugh told the jury that he reported his dispute with Richards over the three $10,000 checks to the local offices of the district attorney and the United States Attorney. The reports did not result in criminal charges against Richards. Braugh testified that he knew that by making the complaint, he was bringing his relationship with Richards to the attention of law enforcement agencies.

The district court carefully limited Braugh's testimony about his dispute with Richards and carefully instructed the jury as to how they could consider the limited testimony admitted. The court did not permit Braugh to present the details of his disagreement with Richards over the checks. Instead, the court limited Braugh's testimony to the fact that he had a dispute with Richards, which he later reported. The court included Braugh's letters to the prosecutors detailing the dispute as part of the record, but did not admit the letters at the trial.[5] The district court found that the testimony had narrow, but significant, probative value. The

---

[5] In the letters, Braugh reported a dispute with Richards and another man named Ron Cravens. According to Braugh, the dispute arose after Richards endorsed the checks to Cravens so that Cravens could cash the checks. However, the checks were postdated. Cravens contacted Braugh and threatened to sue for the amount of the checks. Braugh placed a stop payment order on the checks. When Cravens attempted to cash the checks, the bank returned them unpaid. Cravens continued to threaten Braugh with suit on the checks. Braugh ultimately wrote letters to law enforcement agencies to report the dispute, claiming that Richards and Cravens were "working together in an attempt to extort th[e] money from me by threatening me with prosecution."

26

fact that Braugh reported the dispute to law enforcement tended to support his contention that he did not believe that he and Richards were parties to an unlawful conspiracy. The district court reasoned that Braugh would be unlikely to take any action that could lead to law enforcement investigating his relationship with Richards if he believed that their relationship was criminal.

The district court gave the jury the following instructions about Braugh's limited testimony:

> Let me explain to the jury what's happening. I'm going to let Mr. Braugh testify about this matter, this dispute that he had with Mr. Richards. The nature of the dispute is not really that relevant in this case, and you are not going to be asked to decide whether Mr. Richards was right in this dispute or Mr. Braugh was right in this dispute, I'm letting the fact that Mr. Braugh brought the dispute to the attention of law enforcement agencies be admitted into evidence because you may decide that it's relevant to Mr. Braugh's state of mind, in that, if Mr. Braugh believed that his dealings with Mr. Richards that we have been hearing in this case were illegal. He may not have wanted law enforcement officials to learn of his dealings with Mr. Richards. So that's the only reason I am letting this come into evidence. The exact dispute, who's right and wrong in the dispute, is not relevant. Only the fact that Mr. Braugh's state of mind was such that he was willing to bring the nature of the dispute to law enforcement officials in 1992.

Richards argues that Braugh's testimony lacked probative value. Because "the dispute was totally unrelated to the charged offenses," Braugh would not have been concerned that his complaint would trigger an investigation into his relationship with Richards, and the fact of the report did not tend to show that Braugh viewed his relationship with Richards as lawful. Richards also argues that the evidence of Braugh's reports of his dispute with Richards was cumulative of other evidence showing that Braugh and Richards had a "falling out." Richards asserts that the probative value was

27

minimal and the prejudicial effect significant, given the facial similarity between Braugh's accusations and the conduct alleged in the indictment.

This court reviews the district court's ruling for an abuse of discretion. See Old Chief v. United States, 519 U.S. 172, 174 n. 1 (1997); United States v. Ismoila, 100 F.3d 380, 391 (5th Cir. 1996). "The exclusion of evidence under Rule 403 should occur only sparingly." United States v. Pace, 10 F.3d 1106, 1115 (5th Cir. 1993). The "major function [of Rule 403] is limited to excluding matter of scant or cumulative probative force, dragged in the by the heels for the sake of its prejudicial effect." Id. at 1116(quoting United States v, McRae, 593 F.2d 700, 707 (5th Cir. 1979)).

Contrary to Richards' argument, the evidence admitted did have the probative value defined in the trial judge's limiting instructions. The district court did not admit Braugh's testimony for the purpose of establishing that his report about Richards to law enforcement agencies was true or to show that he and Richards had a dispute. The court instead admitted the fact of Braugh's reports of a dispute with Richards as evidence bearing only on Braugh's contention that he did not believe that he and Richards were parties to a criminal conspiracy. As the government notes, both Braugh's and Richards' attorneys discussed the testimony in their closing arguments, demonstrating its probative value.

Nor was Braugh's testimony so prejudicial as to make its admission, with the district court's limiting instructions, improper. When Braugh testified that Richards attempted to cash the

28

checks despite his agreement with Braugh not to do so, Richards did not object.[6] Richards did not object until the following day, when Braugh testified that he reported the disagreement over the checks to law enforcement agencies. The district court's detailed limiting instruction carefully defined the purpose for which the

---

[6]       "Under the plain error standard, forfeited errors are subject to review only where they are 'obvious,' 'clear,' or 'readily apparent,' and they affect the defendants substantial rights." United States v. Richardson, 168 F.3d 836, 839 n. 9 (5th Cir.)(quoting United States v. Calverley, 37 F.3d 160, 162 (5th Cir. 1994)(en banc), abrogated in part by Johnson v. United States, 520 U.S. 461 (1997)), cert. denied, ___ U.S. ___, 119 S. Ct. 1589 (1999). "Even then, we will not exercise our discretion to correct the forfeited errors unless they 'seriously affect the fairness, integrity, or public reputation of the judicial proceeding.'" Richardson, 168 F.3d at 839 n. 9 (quoting Calverley, 37 F.3d at 164). Braugh testified as follows about Richards' cashing the checks:

> Q:     . . . [W]hat did Al Richards say he needed money for?
> A:     That he had some expenses and some obligations that were due and he needed that money, or, he needed a check from – a check or a series of checks from me to hold as good faith against those debts.
> Q:     . . . [W]hat was your understanding Al Richards was going to do with the money if you sent him the funds?
> A:     Well, I understood at the time that he was going to hold these checks.
>        ....
> Q:     ... [D]id you learn whether or not ultimately or at some later date whether or not these checks had in fact been cashed?
> A:     I did learn later on they had been cashed.

Even if we were to assume that this testimony was "clearly" inadmissible under Rule 403, as Richards urges on appeal, Richards has not shown plain error. He has not shown that the error affected his substantial rights — that is, "affect[ed] the outcome of the proceeding" — much less that the error "seriously affect[ed] the fairness, integrity, or public reputation of [the] judicial proceeding[]." Calverley, 37 F.3d at 164.

29

jury could consider the testimony and mitigated the potential for undue prejudice. See United States v. Bailey, 111 F.3d 1229, 1234 (5th Cir. 1997).

In light of the court's strict limits on Braugh's testimony and instructions limiting the jury's consideration of the testimony, the district court did not err in admitting this evidence.

## B.    THE RULE 404(B) AND HEARSAY CHALLENGES

In rebuttal, and over objections, the government called a witness named Mark McMillan to testify about investments he made through Braugh and Latrasse in 1987 and 1988. These objections are reasserted on appeal.

McMillan testified that he met Braugh in late 1987. Braugh was working from an office in the church to which McMillan belonged, trying to help the financially troubled church raise money. Braugh proposed an investment to McMillan to help solve the church's financial problems. Braugh explained that he "had some kind of bank letter of credit, foreign bank letter of credit deal going where some bank was going to loan him $10 million imminently." Braugh told McMillan that $15,000 would make "the deal" work. Braugh promised that if McMillan invested the $15,000, Braugh would receive $10 million from the European bank; would loan $800,000 to the church; would return $15,000 to McMillan within a few days; and would pay McMillan an additional $15,000. McMillan gave Braugh the $15,000. Neither McMillan nor the church received any money from Braugh.

30

McMillan next saw Braugh several months later, at the offices of Butler Industries. McMillan was there to see the company president, a close personal friend. Braugh was using an office at the company, working to raise money for the financially-troubled business. Braugh proposed another investment opportunity to McMillan. Braugh explained that he had succeeded in securing a $10 million loan from a European bank. The money had been wired and placed in a holding account, but Braugh needed $25,000 to release the funds. Braugh promised that if McMillan invested the $25,000, Braugh would pay him $50,000 before the close of the same business day; would pay the $30,000 owed from the first investment; would loan money to Butler Industries; and would loan the church the money he had promised earlier.

Braugh told McMillan that the transactions would take place through a company called Gold Cloud Development.[7] If the $10 million was not paid as expected, Gold Cloud Development would invest McMillan's money in a movie through a company called San Francisco Productions. Braugh told McMillan that Kurt Latrasse was in charge of both the loan from the European bank and the movie deal and that Braugh was acting at Latrasse's direction.

McMillan testified that, despite suspicions, he decided to give Braugh the $25,000. On April 14, 1988, McMillan had his office manager draft a document to record the promised transactions. In this document, Braugh and Latrasse, referred to

---

[7]     Roger Braugh testified that the Gold Cloud Development Corporation referred to in connection with this transaction was not the same Gold Cloud Development Corporation that was involved in the roll program, of which he was the chairman.

as "Borrower," promised to pay McMillan $50,000 from: (1) "proceeds received on the Roger Braugh/Gold Cloud Development Project (expected loan of $10,000,000.00)"; (2) "proceeds received on the San Francisco Productions Project (expected loan of $10,000,000.00)"; or (3) "other sources as deemed necessary by Borrower." McMillan's staff also drafted a personal guarantee for signature by Braugh and Latrasse individually. McMillan told Braugh that he would pay the $25,000 only after Braugh and Latrasse signed the documents.

McMillan testified that he spoke by telephone to a man identified as Kurt Latrasse after the documents had been faxed to Latrasse:

> A:   . . . . [W]e got him on the telephone in his motel room.
> Q:   Who is the "we," who got him on the telephone?
> A:   Me and Roger Braugh and Robert Cohen, the president of Butler Industries.
> Q:   And who is the "him" that you got on the phone?
> A:   Kurt Latrasse.
> Q:   And what makes you think you had Kurt Latrasse on the telephone?
> A:   He said he was Kurt Latrasse. They dialed the hotel -- I mean, I was told that they were calling Kurt Latrasse. The man got on the phone, said he was Kurt Latrasse. He got the documents. He said he read the documents. He said he was signing them. He said he could not get them notarize [sic] because his secretary was gone to lunch or his notary was gone to lunch, and he signed it, supposedly, they faxed it back to me. I looked at it, I verified the signature, then I paid the money.

Later that day, Roger Braugh faxed McMillan the "loan document," signed "Kurt Latrasse" and "Roger S. Braugh," and the personal

32

guarantee, signed "Roger S. Braugh."  On the fax cover sheet, Braugh wrote: "Kurt's personal guarantee will be here tomorrow because the notary left before we sent the last document to him."

McMillan did not see Braugh again after that day.  He received none of his money back and neither the church nor Butler Industries received a loan.  McMillan filed no complaint and made no attempt to recover the money.

### 1.    Braugh's Challenges to McMillan's Testimony

Braugh argues that the admission of McMillan's testimony violated Rule 404(b) of the Federal Rules of Evidence because the transactions McMillan described were remote in time from, and dissimilar to, the transactions charged in the indictment.  Braugh also argues that, even if the evidence was relevant, its marginal probative value was substantially outweighed by the highly prejudicial impact.

In response, the government argues that the McMillan transactions had substantial similarities to the transactions charged in the indictment, making the evidence highly probative of Braugh's intent.  Braugh put his intent squarely in issue, making McMillan's testimony important rebuttal evidence.  The district court instructed the jury that they were to consider the testimony only on the issue of intent.

The district court's decision to admit Rule 404(b) evidence is reviewed for abuse of discretion.  See United States v. Chavez, 119 F.3d 342, 346 (5th Cir. 1997).  This review is "necessarily heightened" in criminal cases.  United States v. Gonzalez, 76 F.3d 1339, 1347 (5th Cir. 1996)(quoting United States v. Anderson, 933

33

F.2d 1261, 1268 (5th Cir. 1991)). The probative value of the evidence, the need for the evidence by the government on the issue of intent, and the court's limiting instructions are all considered in determining if the court properly admitted the testimony under Rule 404(b).[8]

A trial court must apply the test set out in United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978)(en banc), in determining whether to admit extrinsic evidence under Rule 404(b). Careful application of the Beechum test protects defendants from unfair prejudice in the admission of extrinsic act evidence. See Anderson, 933 F.2d at 1268. The first step of the Beechum test is to determine that the extrinsic offense evidence is relevant to an issue other than the defendant's character. The second step is to determine whether the evidence satisfies Rule 403. See Beechum, 582 F.2d at 911.

The relevance of extrinsic act evidence "is a function of its similarity to the offense charged." Id. When the evidence is admitted to show the defendant's intent to commit the offense charged, "the relevancy of the extrinsic offense derives from the defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic and charged offenses." Id.

_____

[8]     Rule 404(b) of the Federal Rules of Evidence provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

34

"The reasoning is that because the defendant had unlawful intent in the extrinsic offense, it is less likely that he had lawful intent in the present offense." Id. An extrinsic offense is relevant to the issue of intent only if "an offense was in fact committed and the defendant in fact committed it." Id. at 912. The proponent of the evidence need not establish these facts by a preponderance of the evidence; rather, "the evidence in the case must be sufficient to permit a jury, acting reasonably, to find the preliminary facts by a preponderance of the evidence." Anderson, 933 F.2d at 1269. "Once it is determined that the extrinsic offense requires the same intent as the charged offense and that the jury could find that the defendant committed the extrinsic offense, the evidence satisfies the first step under rule 404(b)." Beechum, 582 F.2d at 913.

As to Braugh, McMillan's testimony satisfies the first part of the Beechum test. McMillan's testimony, if believed, would permit a reasonable jury to find by a preponderance of the evidence that Braugh committed fraud in both of the McMillan transactions, involving the same intent as the offenses charged in the indictment.

In performing the second part of the Beechum test, "the task for the court . . . calls for a commonsense assessment of all the circumstances surrounding the extrinsic offense." Id. Several factors affect the probative value of the evidence, including "the extent to which the defendant's unlawful intent is established by other evidence, the overall similarity of the extrinsic and charged offenses, and the amount of time that separates the extrinsic and charged offenses." Chavez, 119 F.3d at 346-47.

McMillan's testimony was highly probative as to Braugh's intent. "The mere entry of a not guilty plea in a conspiracy case raises the issue of intent sufficiently to justify the admissibility of extrinsic offense evidence." United States v. Broussard, 80 F.3d 1025, 1039 (5th Cir. 1996). In this case, the core of Braugh's defense was that he lacked the intent to defraud. Braugh testified, and his attorney argued, that Braugh believed the "roll program" was a legitimate investment. The government had no direct evidence of Braugh's fraudulent intent.

Braugh's arguments as to the dissimilarity between the McMillan transactions and those described in the indictment are without merit. Braugh twice induced McMillan to give him money by describing investments that would result in a European bank paying $10 million to Braugh, yielding McMillan a substantial return in a very short time with no risk of losing his money. The first of the two transactions involved a letter of credit. The "roll program" transactions involved promises that the investors' payments would enable Braugh and the other defendants to obtain a $10 million letter of credit from a foreign bank, which would return the investors' money, plus interest and large profits, in a very short time. Braugh told McMillan that Latrasse was in charge of the investments proposed in the second transaction, just as he would later tell the "roll program" victims that Latrasse was the expert in that investment plan. The three to five years between the McMillan transactions and the later charged offenses does not so diminish the probative value of the evidence as to make it inadmissible. Cf. United States v. Hernandez-Guevara, 162 F.3d

36

863, 872–73 (5th Cir. 1998)(affirming district court's admission of an 18-year-old conviction under Rule 404(b) to show intent), <u>cert. denied</u>, ___ U.S. ___, 119 S. Ct. 1375 (1999); <u>Chavez</u>, 119 F.3d at 346-47(affirming district court's admission of a 15-year-old prior conviction under Rule 404(b) to show intent).

The district court instructed the jury on the limited purpose for which McMillan's testimony could be considered:

> You are going to hear evidence that you may conclude is similar to the acts of Defendants Braugh and Latrasse that are charged in the indictment but that occurred on different occasions than those alleged in the indictment. You must not consider any of the evidence that you are about to hear in deciding if Mr. Braugh or Mr. Latrasse committed the acts charged in the indictment. However, you may consider the evidence for other very limited purposes. If you find beyond a reasonable doubt from the evidence you have heard up to now that Mr. Braugh or Mr. Latrasse committed the acts charged against them in the indictment, then you may consider the evidence that you are about to hear to determine whether Mr. Braugh or Mr. Latrasse had the state of mind or intent necessary to commit the crimes charged against them in the indictment. That is the only purpose for which you may consider the evidence that you are about to hear.

The district court repeated this admonition in his final instructions to the jury. "[T]he danger of unfair prejudice was minimized by the district court's careful instructions to the jury." <u>Gonzalez</u>, 76 F.3d at 1348. The high degree of probative value of McMillan's testimony, balanced against the danger of unfair prejudice the testimony raised, in light of the limiting instructions, leads to the conclusion that the district court acted well within its discretion in admitting the testimony over Braugh's Rule 404(b) objection.

37

Braugh's argument that McMillan's testimony was improper "guilt-by-association" evidence is similarly without merit.[9] "It is well established . . . that the government may not attempt to prove a defendant's guilt by showing that [the defendant] associates with 'unsavory characters.'" United States v. Polasek, 162 F.3d 878, 884 (5th Cir. 1998). McMillan's testimony did not suffer from this defect. McMillan testified about Braugh's acts and statements in inducing McMillan to make the two "investments." The testimony focused on Braugh's own conduct. It did not merely show that Braugh associated with Latrasse. See id. at 885(distinguishing between evidence showing extrinsic wrongdoing on defendant's part, which might be admissible to show knowledge or intent under Rule 404(b), and evidence showing the defendant associated with people who were later convicted of an offense similar to the charged offense, which would be inadmissible guilt-by-association evidence). The district court did not err on this basis in admitting McMillan's testimony.

### 2. Latrasse's Challenges to McMillan's Testimony

Latrasse challenges McMillan's testimony as inadmissible, both because it failed the Rule 404(b) criteria and because parts of McMillan's testimony were hearsay as to Latrasse.

---

[9] Braugh concedes that he did not object to McMillan's testimony specifically on the ground that it was "guilt-by-association" evidence. However, he argues that, based on the record, his Rule 404(b) objection suffices to preserve this argument on appeal. Of course, if Braugh did not timely object to McMillan's testimony on this ground, the plain error standard would apply. See Polasek, 162 F.3d at 883-84. We conclude that McMillan's testimony was not inadmissible "guilt-by-association" evidence even under the abuse of discretion standard.

Latrasse challenges the sufficiency of the evidence showing that "an offense was in fact committed and the defendant in fact committed it." Beechum, 582 F.2d at 913. Specifically, Latrasse argues that McMillan's testimony was insufficient to show that Latrasse was involved with Braugh in the second McMillan transaction. To determine whether there was sufficient evidence to satisfy the first part of the Beechum test, Latrasse's hearsay objection must first be addressed. The statements Latrasse objects to would, if admissible, form part of the evidence showing Latrasse's involvement.

Latrasse objected under Rule 802 to McMillan's testimony that Braugh described Latrasse as the person in charge of the investment, who was giving Braugh direction. The district court admitted McMillan's testimony against Latrasse under Rule 801(d)(2)(D), which defines statements of an agent or employee of the defendant as non-hearsay. Latrasse challenges the district court's ruling.[10]

An out-of-court statement of a declarant is not hearsay if "[t]he statement is offered against a party and is . . . a statement by the party's agent or employee, made during the existence of the relationship." FED. R. EVID. 801(d)(2)(D). The proponent of the evidence must prove the preliminary facts that bring the statement within Rule 801(d)(2)(D), by a preponderance of

---

[10]    Braugh's out-of-court statements about Latrasse were only arguably offered for the truth of the matters asserted in them. However, because the government did not make this argument at trial or on appeal, we do not rest our resolution of the issue on this ground.

39

the evidence.  See United States v. Bourjaily, 483 U.S. 171, 174 (1987).  The statement itself may be considered in making this determination.  See id.  However, "[t]he contents of the statement . . . are not alone sufficient to establish . . . the agency or employment relationship and scope thereof under subdivision (D) . . . ."  FED. R. EVID. 801(d)(2).

McMillan testified that Braugh told him "over and over and over that Kurt Latrasse was the man in charge" of the Gold Cloud Development and San Francisco Productions investments.  McMillan also testified that Braugh said "he was basically acting as an agent for Kurt Latrasse."  These statements provided the only evidence of Latrasse's role as principal and Braugh's as agent in the second transaction Braugh proposed to McMillan.  Neither the loan document bearing Latrasse's signature nor the circumstances under which Latrasse signed it provide proof that Braugh was acting as Latrasse's agent.  In light of the lack of evidence to corroborate Braugh's out-of-court statements that he was acting as an agent for Latrasse, Rule 801(d)(2)(D) cannot serve as the basis for the admission of these statements against Latrasse.

However, even if McMillan's testimony should not have been admitted against Latrasse under Rule 801(d)(2)(D), other grounds for admission remove any harmful error.  See United States v. Lopez, 979 F.2d 1024, 1033 (5th Cir. 1992).  The government urges that the testimony was admissible under Rule 801(d)(2)(E), which takes an out-of-court statement outside the hearsay rule if the statement "is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of

40

the conspiracy." FED. R. EVID. 801(d)(2)(E). Although the indictment did not allege an earlier conspiracy in connection with the McMillan transactions, "the conspiracy that forms the basis for admitting coconspirators' statements need not be the same conspiracy for which the defendant is indicted." United States v. Arce, 997 F.2d 1123, 1128 (5th Cir. 1993).

Before admitting evidence under Rule 801(d)(2)(E), the proponent must "establish by a preponderance of the evidence that the declarant and the defendant were involved in a conspiracy and that the statements were made during and in furtherance of the conspiracy." United States v. Broussard, 80 F.3d 1025, 1038 (5th Cir. 1996); see also Bourjaily, 483 U.S. at 175-76. Under Rule 104(a) of the Federal Rules of Evidence, a court "is not bound by the rules of evidence except those with respect to privileges" in determining the existence of preliminary facts to support the admission of evidence. See also Bourjaily, 483 U.S. at 178. The out-of-court statement itself may be considered in determining the existence of the conspiracy and other preliminary facts. See id. at 177–81; FED. R. EVID. 801(d)(2). However, the out-of-court statement alone is not sufficient to support its own admission. See FED. R. EVID. 801(d)(2).

Braugh made the statements as part of his efforts to induce McMillan to give him money a second time. There is sufficient evidence to show that Braugh and Latrasse conspired in this effort to defraud McMillan. The trial record included the following evidence that Braugh and Latrasse were parties to such a conspiracy:

41

- McMillan testified that Braugh told him "over and over again that Latrasse was in charge" of the Gold Cloud Development transaction and the San Francisco Production movie deal.

- McMillan testified that Braugh said that "he was basically acting as an agent for Kurt Latrasse."

C   After McMillan refused to give Braugh any money unless Latrasse signed a loan document and personal guarantee drafted by McMillan's staff, those documents were faxed to Latrasse.

- Braugh and McMillan telephoned the hotel where Latrasse was staying. They were connected to a man who identified himself as Kurt Latrasse. That man stated that he had received the documents that McMillan's staff drafted and was signing them.

C   Braugh faxed McMillan the loan document bearing a signature purporting to be that of Kurt Latrasse.

- The signature of Kurt Latrasse was very similar to Latrasse's signature on other documents previously admitted as evidence in the trial.

This evidence shows the predicate facts making Braugh's statements about Latrasse admissible under Rule 801(d)(2)(e). The record discloses sufficient evidence to show by a preponderance of the evidence that Latrasse and Braugh conspired to defraud McMillan. Braugh's out-of-court statements in furtherance of the conspiracy were admissible under Rule 801(d)(2)(E) of the Federal Rules of Evidence.

In light of this determination, we return to the first part of the Beechum test to consider whether McMillan's testimony was admissible against Latrasse under Rule 404(b). Under the circumstances presented in this case, there was sufficient evidence to permit a rational jury to find that Latrasse committed an offense involving fraud for the purpose of the Beechum analysis.

42

McMillan's testimony also satisfies Rule 403, the second part of the Beechum test. Latrasse placed his intent at issue by testifying that he believed the "roll program" was legitimate. The evidence of the second McMillan transaction was probative rebuttal evidence, particularly given the similarity between Latrasse's role in the extrinsic offense and his role in the charged offenses.

Braugh described Latrasse to McMillan as the person in charge of the proposed investments; later, Latrasse was presented to the roll program investors as the expert in such transactions. In both schemes, when an investor expressed concern or doubt, Latrasse was called in to provide reassurance. McMillan's testimony was probative on the issue of Latrasse's intent. The district court gave a careful limiting instruction to the jury, minimizing the prejudicial impact of McMillan's testimony. See Gonzalez, 76 F. 3d at 1348. Balancing the probative value against the danger of unfair prejudice in light of the limiting instruction, the district court did not abuse its discretion in admitting McMillan's testimony against Latrasse over his Rule 404(b) objection.

Moreover, even if McMillan's testimony was inadmissible, the error was, on this record, harmless. See United States v. Cornett, 195 F.3d 776, 784 (5th Cir. 1999). The erroneous admission of McMillan's testimony would require reversal of Latrasse's conviction only if the evidence had a "substantial impact" on the verdict. See United States v. Dickey, 102 F. 3d 157, 163 (5th Cir. 1996); United States v. El-Zoubi, 993 F.2d 442, 446 (5th Cir. 1993). The trial record discloses ample evidence of Latrasse's guilt. The evidence shows that Latrasse repeatedly provided Hayes,

43

Schwinger, and Blackwelder assurances as to the legitimacy and profitability of the roll program long after he knew that the money had not been invested as promised and was not producing the promised returns. The record shows that Latrasse gave the investors detailed and varying explanations, promises, and excuses long after the investors' money had already been disbursed to the defendants, including Latrasse. In the context of the ample evidence of Latrasse's criminal intent in the record, McMillan's testimony did not have a "substantial impact" on the jury verdict so as to require reversal.

## V.     THE CHALLENGE TO THE JURY INSTRUCTIONS

All three defendants argue that the district court erred in rejecting the defendants' proposed jury instruction as to the relationship between breach of fiduciary duty and criminal liability.

John Shockey testified as the government's expert witness on international banking practices and financial fraud. During cross-examination, Braugh's attorney asked Shockey whether "people in the phony money world" ever used "people in the legitimate money world" to promote fraudulent investment schemes. In response, Shockey testified:

> Well, while that could happen, we would hope that proper due diligence would be done. And if the parties involved hold themselves out as knowledgeable and experienced financial advisors, they have a fiduciary responsibility to their clients to conduct due diligence to protect the interests of their clients.

44

Latrasse's attorney later asked Shockey several questions to clarify that "due diligence" and "fiduciary responsibility" were terms from civil, not criminal, law.

Latrasse timely requested the trial court to include the following language in the court's jury instructions: "Neither a failure to exercise due diligence nor a breach of fiduciary duty in and of themselves rise to the level of specific intent to defraud. Before you may find a Defendant guilty of fraud, you must find beyond a reasonable doubt that the Defendant had the specific intent to defraud."  The other defendants joined in the request. The district court did not give the instruction.

A district court's refusal to provide a requested jury instruction is reviewed for abuse of discretion.  United States v. Jobe, 101 F.3d 1046, 1059 (5th Cir. 1996).  Such a refusal requires reversal only if the requested instruction (1) was a substantially correct statement of the law, (2) was not substantially covered in the charge as a whole, and (3) concerned an important point in the trial such that the failure to instruct the jury on the issue seriously impaired the defendant's ability to present a given defense.  See United States v. Webster, 162 F.3d 308, 322 (5th Cir. 1998), cert. denied, ___ U.S. ___, 120 S. Ct. 83 (1999); Jobe, 101 F.3d at 1059.

The district court instructed the jury, in relevant part, as follows:

> The word "knowingly," as that term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally, not because of mistake or accident.

45

Good faith is a complete defense to the charges in the indictment, since good faith on the part of the defendant is inconsistent with intent to defraud, which is an essential part of the charges. The burden of proof is not on a defendant to prove his good faith, since a defendant has no burden to prove anything. The government must establish beyond a reasonable doubt that the defendants acted with specific intent to defraud as charged in the indictment.

One who expresses an opinion honestly held by him, or a belief honestly entertained by him, is not chargeable with fraudulent intent even though his opinion is erroneous or his belief is mistaken; and, similarly, evidence which establishes only that a person made a mistake in judgment or an error in management, or was careless, does not establish fraudulent intent.

On the other hand, an honest belief on the part of the defendant that a particular business venture was sound and would ultimately succeed would not, in and of itself, constitute "good faith" as used in these instructions if, in carrying out that venture, the defendants knowingly made false or fraudulent representations to other with the intent to deceive them.

The district court also instructed the jury on the level of intent required for conviction on each of the offenses charged in the indictment. As to the conspiracy charge, the district court instructed the jury as follows:

For you to find a defendant guilty of conspiracy, you must be convinced that the government has proved . . . beyond a reasonable doubt . . . [t]hat the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose . . . .
One may become a member of a conspiracy without knowing all the details of the unlawful scheme or the identities of all the other alleged conspirators. If a defendant understands the unlawful nature of the plan or scheme and knowingly and intentionally joins in that plan or scheme on one occasion, that is sufficient to convict him of conspiracy . . . .

46

The district court also instructed the jury on the <u>Pinkerton</u> doctrine of accomplice liability.[11]

As to the interstate transportation of stolen property charge, the district court instructed the jury that "to find the defendant guilty of this crime, you must be convinced that the government has proved . . . beyond a reasonable doubt [that] the defendant devised a scheme to defraud one or more persons of at least $5,000." The district court instructed the jury on the elements of mail fraud and wire fraud, in relevant part, as follows:

> For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:
> First: That the defendant knowingly created a scheme to defraud, that is a scheme to obtain money, funds, or credits from another by means of false pretenses, representations and promises substantially as alleged in this Indictment;
> Second: That the defendant acted with the specific intent to commit fraud . . . .

The district court's instructions to the jury, considered as a whole, substantially covered the defendants' requested instruction. Defendants fully presented their theory of defense, their belief that the roll program was a legitimate investment. In his closing argument, Latrasse's attorney argued that a breach of fiduciary duty does not necessarily give rise to criminal liability. "[C]ounsel was not circumscribed in his argument to the jury" on

---

[11]     Under <u>Pinkerton v. United States</u>, 328 U.S. 640, 666 (1946), "[a] party to a continuing conspiracy may be responsible for a substantive offense committed by a coconspirator pursuant to and in furtherance of the conspiracy, even if that party does not participate in the substantive offense or have any knowledge of it." <u>United States v. Castillo</u>, 179 F.3d 321, 324 n. 4 (5th Cir. 1999)(quoting <u>United States v. Elwood</u>, 993 F.2d 1146, 1151 (5th Cir. 1993)) (alterations in original), <u>cert. granted</u>, ___ U.S. ___, 2000 WL 21143 (2000).

the theory of defense.  United States v. Storm, 36 F.3d 1289, 1295 (5th Cir. 1994).  The district court's charge adequately instructed the jury that they could not convict any defendant unless the government proved, beyond a reasonable doubt, that the defendant had the specific intent to defraud.  See United States v. Giraldi, 86 F.3d. 1368, 1376 (5th Cir. 1996) (affirming district court's denial of a requested instruction on good faith because the charge detailed specific intent and defined "willfully" and "knowingly").  The defendants were not entitled to more specific instructions on the distinctions between the civil terms "due diligence" and "fiduciary responsibility" on the one hand, and criminal liability on the other.

The district court's refusal to give the defendants' requested instruction was not error.

## VI.  THE CHALLENGES TO THE SUFFICIENCY OF THE EVIDENCE

All defendants challenge the sufficiency of the evidence supporting some or all of their convictions.  In assessing these challenges, "[t]his court must view the evidence in the light most favorable to the jury verdict and affirm if a rational trier of fact could find that the government proved all essential elements beyond a reasonable doubt."  Giraldi, 86 F.3d 1368, 1372 (5th Cir. 1996).  We consider "the countervailing evidence as well as the evidence that supports the verdict."  United States v. Brown, 186 F.3d 661, 664 (5th Cir. 1999)(quoting Giraldi, 86 F.3d at 1272).

"It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt provided a reasonable trier

of fact could find that the evidence establishes guilt beyond a reasonable doubt." United States v. Bell, 678 F.2d 547, 549 (5th Cir. Unit B 1982); see United States v. Soape, 169 F.3d 257, 264 (5th Cir.), cert. denied, ___ U.S. ___, 119 S. Ct. 2353 (1999). The jury is free to choose among reasonable constructions of the evidence. See United States v. Ortega Reyna, 148 F.3d 540, 543 (5th Cir. 1998). If, however, "the evidence, viewed in the light most favorable to the government, gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, the conviction should be reversed. United States v. Pennington, 20 F.3d 593, 597 (5th Cir. 1994); see Ortega Reyna, 148 F.3d at 543. "When the evidence is essentially in balance, a reasonable jury must necessarily entertain a reasonable doubt." Ortega Reyna, 148 F.3d at 543.

*A.   Richards*

Richards argues that the evidence was insufficient to support his conviction for inducing a person to travel in interstate commerce in furtherance of a scheme to defraud and his conviction for wire fraud. He does not challenge the sufficiency of the evidence supporting his conspiracy conviction.

*1.   Interstate Transportation*

18 U.S.C. § 2314 "requires proof of two elements to support a conviction: (1) that the defendant devised a scheme intending to defraud victim of money or property of a minimum value of $ 5,000,and (2) that as a result of this scheme, a victim was induced to travel in interstate commerce." United States v. Myerson, 18

49

F.3d 153, 164 (2d Cir. 1994); see also United States v. Biggs, 761 F.2d 184, 187 (4th Cir. 1985).[12]

Richards does not challenge the proof that he induced Bert Hayes to travel from Arkansas to Texas to meet with Richards and deliver a $250,000 check. Richards' argument is narrow. He asserts that the evidence was insufficient to permit a reasonable jury to find that he induced Hayes to cross state lines with the specific intent to defraud Hayes. See United States v. Snelling, 862 F.2d 150 (8th Cir. 1988) (holding that it is an essential element of the interstate transportation offense under section 2314 that the defendant had the intent to defraud at the time the victim crossed state lines as a result of the defendant's inducement).

The record, viewed in the light most favorable to the verdict, contains evidence sufficient to support Richards' conviction on count 2. Richards promoted the roll program to Hayes, promising that the money invested would be safe and would generate substantial returns. The roll program described to Hayes did not exist. John Shockey, the government's expert on international banking practices and financial fraud, testified that no such investment existed in the legitimate financial world.

---

[12] Section 2314 provides in relevant part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . induces any person . . . to travel in, or be transported in interstate . . . commerce in the execution or concealment of a scheme or artifice to defraud that person . . . of money or property of $ 5,000 or more . . . [s]hall be fined under this title or imprisoned not more than ten years, or both.

50

A reasonable jury could conclude that Richards knew the roll program was not legitimate when he induced Hayes to travel to Texas with his $250,000 check. Richards pitched an investment program that did not exist in the legitimate financial world. He continued his participation in the scheme, soliciting additional investors and later lulling them into continuing to believe that the program existed and was working long after he knew that at least some of the money had gone to the promoters rather than to the investors and that they investors had not received any of the money promised them. The evidence that Richards continued to solicit and reassure investors after he knew that the program had failed to perform as he had promised supports the inference that Richards knew the program was a fraud from the outset, when he induced Hayes to invest in the program and to cross state lines to deliver his check.

### 2. Wire fraud

"In order to establish wire fraud [under 18 U.S.C. § 1343], the Government must prove that a defendant knowingly participated in a scheme to defraud, that interstate wire communications were used to further the scheme, and that the defendants intended that some harm result from the fraud." United States v. Powers, 168 F.3d 741, 746 (5th Cir.), cert. denied, ___ U.S. ___, 120 S. Ct. 360 (1999); see also United States v. St. Gelais, 952 F.2d 90, 95 (5th Cir. 1992). "An intent to defraud for the purpose of personal gain satisfies the 'harm' requirement of the wire fraud statute." Powers, 168 F.3d at 746; St. Gelais, 952 F.2d at 95. A use of the interstate wire facilities is in furtherance of a scheme to defraud

if it is "incident to an essential part of the scheme." Schmuck v. United States, 489 U.S. 705, 710–11 (1989) (citations omitted); see also Powers, 168 F.3d 741, 747 (5th Cir. 1999). A defendant need not personally have made the communication on which the wire fraud count is based, nor have directed that it be made. "The test to determine whether a defendant caused [interstate wire facilities] to be used is whether the use was reasonably foreseeable." United States v. Massey, 827 F.2d 995, 1002 (5th Cir. 1987)(interpreting the mail fraud statute).[13] For a defendant to be convicted of wire fraud, it is sufficient that the defendant could reasonably have foreseen the use of the wires; the interstate nature of the wire communication need not have been reasonably foreseeable. See United States v. Lindemann, 85 F.3d 1232, 1241 (7th Cir. 1996); United States v. Blackmon, 839 F.2d 900 (2d Cir. 1988); cf. United States v. Kelly, 569 F.2d 928, 934 (5th Cir. 1978)(holding that the interstate transportation offense, 18 U.S.C. § 2314, included no level of *mens rea* as to the interstate nexus because the interstate nexus requirement was merely "the linchpin for federal jurisdiction"); United States v. Darby, 37 F.3d 1059, 1067 (4th Cir. 1994)(holding the same under 18 U.S.C. § 875, which prohibits the transmission of a threatening communication in interstate commerce).

Richards asserts that the use of the wires charged in count 3 of the indictment was not reasonably foreseeable. This count

---

[13] Because the language of the mail fraud and wire fraud statutes are so similar, cases construing one are applicable to the other. See United States v. Herron, 825 F.2d 50, 54 n. 5 (5th Cir. 1987); United States v. Bentz, 21 F. 3d 37, 40 (3d Cir. 1994).

charges the September 17, 1991 wire transfer of $7,500 from Texas to Kurt Latrasse in California.  The record evidence supports the conclusion that the wire transfer to Latrasse was a distribution of proceeds from the roll program scheme.  Richards reasonably could have foreseen that a distribution of the investors' funds to the defendant promoters might be made by use of wire transfers.  The evidence was sufficient to support Richards' conviction on count 3.

   *B.    Braugh*

Braugh challenges the sufficiency of the evidence supporting his conspiracy, interstate transportation, wire fraud, and mail fraud convictions.  We uphold the convictions on all six counts.

   *1.    Conspiracy*

Braugh was convicted of conspiracy to commit mail and wire fraud under 18 U.S.C. § 371.  "To establish a violation of [section 371], the government must prove  beyond a reasonable doubt (1) that two or more people agreed to pursue an unlawful objective, (2) that the defendant voluntarily agreed to join in the conspiracy, and (3) that one or more members of the conspiracy committed an overt act to further the objectives of the conspiracy."  United States v. Soape, 169 F.3d 257, 264 (5th Cir.), cert. denied, ___ U.S. ___, 119 S. Ct. 2353 (1999).

   "To be guilty of conspiracy to commit mail [and wire] fraud, [the defendant] must have had the requisite intent to commit mail [and wire] fraud."  United States v. Sneed, 63 F.3d 381, 385 (5th Cir. 1995).  Neither "[m]ail fraud [nor wire fraud], however, has [a] specific intent requirement regarding use of the mails [or wire facilities]."  Id. (quoting United States v. Massey, 827 F.2d 995,

53

1002 (5th Cir. 1987)). "The test to determine whether a defendant caused the mails [or interstate wire facilities] to be used is whether the use was reasonably foreseeable. The defendant need not intend to cause the mails [or wire facilities] to be used." Sneed, 63 F.3d at 385 (quoting Massey, 827 F.2d at 1002). "The government's burden, therefore, is to demonstrate beyond a reasonable doubt that [the alleged conspirators] agreed to engage in a scheme to defraud in which they contemplated that the [wire facilities] would likely be used." Sneed, 63 F.3d at 385 (quoting Massey, 827 F.2d at 1002).

Braugh contends that the evidence was not sufficient to permit a reasonable jury to conclude that he was a party to a conspiracy to commit wire fraud and mail fraud. At most, he claims, the evidence shows that the defendants participated in a failed business together, not that they agreed to commit a crime. Braugh points out that he was not present when either Schwinger or Hayes signed contracts to invest in the roll program.

The lack of direct evidence of agreement to commit a crime does not require reversal. Each element of a section 371 conspiracy may be inferred from circumstantial evidence. See United States v. Faulkner, 17 F.3d 745, 768 (5th Cir. 1994). Concert of action can indicate an agreement. See United States v. Lopez, 979 F.2d 1024, 1029 (5th Cir. 1992). The record contains ample circumstantial evidence to support Braugh's conspiracy conviction. Braugh and others induced Hayes, Schwinger, and Blackwelder to part with their money and in lulling them into continued belief that their money was safely invested. The bank

54

records showed that nearly all Hayes's money was moved from Braugh's Shearson Lehman account within one month of deposit and transferred to accounts in the defendants' names at different banks, including Braugh's accounts. Most of the money Schwinger invested was also transferred from a Shearson Lehman account to accounts held by Richards, Braugh, and Latrasse, within a short time.

The evidence showed the defendants' coordinated acts to implement their fraudulent scheme, including the use of the mails and wire facilities to distribute the proceeds of the fraud and to lull the investors as they grew anxious about their money. In light of the other evidence in the record, the jury was free to disbelieve Braugh's self-serving testimony that he thought the "roll program" was a legitimate investment. See United States v. Brown, 186 F.3d 661, 667 (5th Cir. 1999); United States v. Ruiz, 860 F.2d 615, 619 (5th Cir. 1988). The evidence was sufficient to permit a reasonable jury to find that Braugh conspired to commit wire and mail fraud.

### 2. Interstate Transportation

Braugh argues that there is no evidence that he, rather than Richards, induced Hayes to travel from Arkansas to Texas with the $250,000 check. The interstate transportation element "is merely the linchpin for federal jurisdiction and bears no relationship, in terms of culpability, to the underlying criminal acts which are the objects of [section] 2314." United States v. Kelly, 569 F.2d 928, 934 (5th Cir. 1978) (quoting United States v. Ludwig, 523 F.2d 705, 707 (8th Cir. 1975)). The government need not prove that Braugh

55

knew that Hayes would travel in interstate commerce.  See Kelly, 569 F.2d at 934.  Indeed, the government need not show that Braugh directly caused Hayes to travel across state lines.  See id. at 934–35.  It is enough if Braugh "was a motivating force in the transportation."  Id. at 935 (quoting Thogmartin v. United States, 313 F.2d 589 (8th Cir. 1963)).

In Kelly, this court upheld a section 2314 interstate transportation conviction over a sufficiency of the evidence challenge.  The defendant had devised a scheme to sell shares in a nonexistent mutual fund.  He sold shares in the fund to an individual, who in turn transferred them to a third party. As part of the transaction, the immediate and secondary purchasers met in the Bahamas.  This travel provided the interstate transportation element of the original seller's section 2314 conviction.  The court held that the original seller was a "motivating force" in the ultimate buyer's interstate travel, despite the fact that it was the original buyer who induced the ultimate buyer to make the trip.

In this case, although Richards persuaded Hayes to cross state lines to deliver his roll program check, Braugh's involvement in the roll program made him a "motivating force" in Hayes's travel. The evidence sufficed to permit a reasonable jury to find that Braugh violated section 2314.

3.   *Wire Fraud*

Braugh was convicted of three counts of wire fraud under 18 U.S.C. § 1343.  His limited claim on appeal is that because there was insufficient evidence to show that he knowingly participated in a scheme to defraud, there was also insufficient evidence to

56

support his wire fraud convictions. The same record evidence that led to the rejection of Braugh's sufficiency of the evidence challenge to his conspiracy conviction also leads this court to reject Braugh's challenge to the wire fraud convictions.

### 4. Mail Fraud

Count 6 of the indictment charged Braugh with mail fraud under 18 U.S.C. § 1341, based on Braugh's November 22, 1993 letter to Blackwelder, promising to send a cashier's check to repay the $5,000 "loan." Braugh argues that there was insufficient evidence to show that he participated in a scheme to defraud. The argument is without merit.

### C. Latrasse

Latrasse challenges his conviction on all counts on the basis of insufficiency of the evidence. Latrasse argues that because he did not talk to any investors until after they had made their investments, he did not induce anyone to part with their money. Latrasse also asserts that he believed the roll program to be legitimate.

### 1. Conspiracy

The record presented sufficient evidence to permit a rational jury to find Latrasse guilty of conspiracy to commit wire and mail fraud. The fact that Latrasse did not speak to the investors until after they had parted with their funds does not preclude his membership in the conspiracy. Ample evidence showed that Latrasse worked to induce the participants to continue believing that the roll program existed and that their money was safe. Latrasse lulled the investors when they protested the lack of the promised

57

payments. Latrasse's lulling efforts furthered the fraudulent scheme. Cf. United States v. Allen, 76 F.3d 1348, 1363 (5th Cir. 1996)(holding that actions designed to avoid detection after the defendants had control over the money produced by the fraud were in furtherance of the fraud under the mail fraud statute); cf. also United States v. Perry, 152 F.3d 900, 904 (8th Cir. 1998)(holding that mailings designed to lull the victims into a false sense of security and hide a fraudulent scheme are considered an overt act in furtherance of a conspiracy to commit mail fraud and wire fraud), cert. denied, ___ U.S. ___, 119 S. Ct. 1088 (1999).

The evidence was also sufficient for the jury to disbelieve Latrasse's self-serving testimony and conclude that Latrasse knew the investment program was not legitimate. Latrasse knew the investors were not receiving the payments as promised when he repeatedly assured them that their money was safely invested and earning returns. He knew that money received from two investors had been quickly transferred from the initial deposits in the Shearson Lehman investment accounts to the defendants, including Latrasse. There was ample circumstantial evidence showing that Latrasse knew the roll program was fraudulent when he assured the investors of its legitimacy. There was also clear evidence showing that the use of the mails and wire facilities in furtherance of the fraud was reasonably foreseeable. Latrasse's challenge to his conviction on count 1 fails.

2. *Interstate transportation*

A party to a conspiracy may be held criminally responsible for a substantive offense committed by a coconspirator in furtherance

58

of the conspiracy if the offense was reasonably foreseeable and was committed during that party's membership in the conspiracy. See United States v. Castillo, 179 F.3d 321, 324 n. 4 (5th Cir. 1999)(describing the Pinkerton doctrine), cert. granted, ___ U.S. ___, 2000 WL 21143 (2000); United States v. Dean, 59 F.3d 1479, 1490 n. 20 (5th Cir. 1995)(holding that the offense must have been reasonably foreseeable for the defendant to face accomplice liability under the Pinkerton doctrine); United States v. Basey, 816 F.2d 980, 998-99 (5th Cir. 1987). We have already found the evidence sufficient to show that Latrasse conspired to commit mail and wire fraud and that Richards and Braugh induced Hayes to travel in interstate commerce with the intent to defraud.

The question as to Latrasse's conviction on count 2 is the sufficiency of the evidence to show that Latrasse was a member of the conspiracy when Richards induced Hayes to cross state lines on September 5, 1991 to participate in the roll program. Latrasse points out that he did not begin communicating with the roll program investors until early 1992. However, the record also shows that Latrasse received a $7,500 wire transfer from Braugh's Bank of Corpus Christi account on September 11, 1991 and a $5,000 transfer on September 17, 1991. Brewer testified that Latrasse received money from Hayes's deposit, only days after Hayes wrote his check. A reasonable jury could conclude that Latrasse was a member of the conspiracy when Hayes crossed state lines to deliver the check. There is no basis to reverse Latrasse's conviction on count 2.

*3. Wire fraud*

Latrasse challenges his convictions on the three counts of wire fraud. The first of these counts involved the $7,500 September 11, 1991 wire transfer from Braugh's Bank of Corpus Christi account in Texas to Latrasse in California. The evidence was sufficient to permit a rational jury to conclude that this transfer was a distribution of proceeds from the fraudulent scheme, in furtherance of that scheme and reasonably foreseeable to Latrasse.

The second count, Count 4, involved a fax from Latrasse in California to Schwinger in Texas on June 19, 1992. In the fax, Latrasse promised a distribution of funds to Schwinger and her partners on or before June 30, 1992. The evidence was clearly sufficient for a reasonable jury to find that Latrasse sent this fax to further the fraudulent scheme by lulling Schwinger into continuing to believe that her money was safely invested, as promised. See United States v. Allen, 76 F.3d 1348, 1363 (5th Cir. 1996)(holding that "actions taken to avoid detection, or to lull the fraud victim into complacency" are in furtherance of the fraud for the purpose of the wire fraud statute); see also United States v. Maze, 414 U.S. 395, 402–03 (1974). The evidence was sufficient to support Latrasse's conviction on count 4.

The third wire fraud offense, alleged in count 5 of the superseding indictment, involved a February 2, 1994 fax that Latrasse sent from California to Blackwelder in Texas. In the fax, Latrasse promised to send Blackwelder a check returning his investment. Again, the evidence was sufficient to support a

60

finding that Latrasse sent this fax to lull Blackwelder into continuing to believe the investment was legitimate. There was sufficient evidence to permit a rational jury to convict Latrasse on count 5 of the indictment.

### 4. *Mail fraud*

The mail fraud offense alleged in count 6 of the superseding indictment arose from a November 22, 1993 letter Braugh sent to Blackwelder by mail. In the letter, Braugh promised to send Blackwelder a cashier's check repaying the July 8, 1993 $5,000 "loan."

The evidence show that in the weeks leading up to the loan, Blackwelder had asked Braugh several times when he would receive the promised payments from the roll program. Braugh repeatedly assured Blackwelder that he would receive the money soon, giving such excuses as "it's going to happen in a day, it's going to happen in two days, it's going to happen in a week, there's a problem, a little problem, it's going to be good in a day." Blackwelder continued to press. As part of Braugh's efforts to lull Blackwelder into believing the roll program was legitimate, Braugh explained that there were problems in Europe that needed attention and asked for a $5,000 loan so that Braugh could travel to Europe and "help expedite the transaction."

Blackwelder tried to recover his money from Braugh. In a telephone conversation on November 19, 1993, Braugh told Blackwelder that the unpaid loan "was the only mistake he made in executing his little ordeal here." Three days later, Braugh sent Blackwelder the letter that forms the basis for count 6. In the

letter, Braugh promised to give Blackwelder a cashier's check to repay the loan within one week.

After the November 22, 1993 letter, Blackwelder did not see or speak to Braugh for approximately six months. However, Latrasse continued to call Blackwelder to assure him that payment on his roll program investment was imminent. On February 2, 1994, Latrasse sent Blackwelder a fax, telling Blackwelder that Latrasse had designated a "disinterested third party to deliver the check for the pay-out" on Blackwelder's investment. The fax continued:

> It is regrettable that this project took longer than programmed and that this led to the hard feelings between you and Roger. Hope that we can quickly resolve the remaining business between yourself and SAI [Associates] and Roger's personal obligation to you.

A reasonable jury could conclude that Braugh's November 22, 1993 letter to Blackwelder was in furtherance of the scheme to defraud. Braugh solicited the loan from Blackwelder in the context of reassuring Blackwelder about the roll program. Braugh told Blackwelder that the $5,000 loan would help him make a trip to Europe to fix problems with the roll program and "expedite the transaction." Three days before he sent Blackwelder the November 22, 1993 letter promising to repay the $5,000, Braugh told Blackwelder that failing to repay the $5,000 was "the only mistake he made" in connection with the roll program. The November 22, 1993 letter was another instance of lulling, another assurance that money promised would be paid soon. In his February 2, 1994 fax to Blackwelder, Latrasse, seeking to reassure Blackwelder about the roll program generally, stated: "I hope that we can quickly resolve the remaining business between yourself and SAI and Roger's

62

personal obligation to you." Braugh obtained the $5,000 "loan" through his involvement in the roll program. Latrasse was clearly aware that Braugh had done so. Braugh's and Latrasse's statements and written communications evidence their recognition that assurances about the $5,000 transaction were part of keeping Blackwelder satisfied about the status of the roll program. Braugh's lulling letter "was incident to an essential part" of the roll program scheme, which Latrasse could reasonably have foreseen.

The evidence was sufficient to support Latrasse's conviction on count 6.

## VII. THE RESTITUTION ORDER

Richards and Braugh argue that the district court erred in applying the Mandatory Victims Restitution Act (MVRA) in setting the amount of restitution. They contend that the Ex Post Facto Clause of the United States Constitution precludes the application of the MVRA to conduct occurring before April 24, 1996, the effective date of the Act. The conduct underlying their convictions occurred well before then. Defendants did not object to the orders of restitution at trial. Plain error applies. United States v. Cihak, 137 F.3d. 252, 264 n. 7 (5th Cir.), cert. denied, ___ U.S. ___, 119 S. Ct. 118 (1998), and cert. denied, ___ U.S. ___, 119 S. Ct. 203 (1998).

The MVRA amended the Victim Witness Protection Act ("VWPA"), 18 U.S.C. §§ 3663–3664. Before the amendments to the VWPA, the statute required a court to consider a defendant's ability to pay in setting the amount of a restitution order. As amended, the statute provides that "the court shall order restitution to each

63

victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A). Richards and Braugh contend that the MVRA, by forbidding the trial court to consider a defendant's ability to pay in setting the amount of restitution, causes an increase in the punishment a defendant faces for a given offense. They argue that "retroactive" application of the Act to conduct occurring before its effective date violates the Ex Post Facto Clause.

The MVRA provides that it "shall, to the extent constitutionally permissible, be effective for sentencing proceedings in cases in which the defendant is convicted on or after the date of enactment of this Act." See 18 U.S.C. § 2248 (statutory notes). If application of the MVRA to a given defendant would violate the Ex Post Facto Clause, the district court must apply the pre-amendment VWPA in determining restitution.

A law violates the Ex Post Facto Clause if (1) it "appl[ies] to events occurring before its enactment," and (2) it "disadvantage[s] the offender affected by it by altering the definition of criminal conduct or increasing the punishment for his crime." Lynce v. Mathis, 519 U.S. 433, 441 (1997)(quoting Weaver v. Graham, 450 U.S. 24, 30 (1981)). Although this court has not yet addressed the issue, several federal circuit courts have considered whether application of the MVRA to conduct occurring before its enactment would violate the Ex Post Facto Clause. The majority of these courts have held that retroactive application of the MVRA would violate the Ex Post Facto Clause. Compare United

64

States v. Siegel, 153 F.3d 1256, 1260 (11th Cir. 1998)(holding that it would violate the Ex Post Facto Clause to apply the MVRA to a person whose criminal conduct occurred prior to its passage); United States v. Edwards, 162 F.3d 87, 89-90 (3d Cir. 1998)(same); United States v. Baggett, 125 F.3d 1319, 1321-1322 (9th Cir. 1997)(same); United States v. Thompson, 113 F.3d 13, 15 n. 1 (2d Cir. 1997)(same); United States v. Rezaq, 134 F.3d 1121, 1141 n. 13 (D.C. Cir.), cert. denied, ___ U.S. ___, 119 S. Ct. 90 (1998); and United States v. Williams, 128 F.3d 1239, 1241 (8th Cir. 1997)(holding that an order of restitution under the MVRA is punishment under the Ex Post Facto Clause and suggesting that retroactive application of the Act would violate that clause); with United States v. Nichols, 169 F.3d 1255, 1278-80 (10th Cir.)(holding that retroactive application of the MVRA did not violate the Ex Post Facto Clause), cert. denied, ___ U.S. ___, 120 S. Ct. 336 (1999); United States v. Newman, 144 F.3d 531, 537 (7th Cir. 1998)(same).

The circuits approving retroactive application of the MVRA, the minority approach, have reasoned that restitution orders under the Act are not punishment for the purpose of Ex Post Facto Clause analysis. This circuit's precedent does not provide a basis to adopt this reasoning. This circuit has held that restitution imposed under the VWPA is punishment for the purpose of the Ex Post Facto Clause. See United States v. Rose, 153 F.3d 208, 211 n. 1 (5th Cir. 1998); United States v. Corn, 836 F.2d 889, 895-96 (5th Cir. 1988). By requiring the court to order restitution in the full amount of loss, without considering the defendant's ability to

65

pay, the MVRA increases the severity of the punishment a defendant faces as compared to the pre-amendment VWRA. See Siegel, 153 F.3d at 1260; see also Lindsey v. Washington, 301 U.S. 397 (1937). Retroactive application of the MVRA to Richards and Braugh would violate the Ex Post Facto Clause.

However, Braugh and Richards have not shown that the challenged orders of restitution resulted from retroactive application of the MVRA. Nothing in the record suggests that the district court applied the MVRA in this case. During each defendant's sentencing, the district court adopted the presentence report, which included specific findings about that defendant's ability to pay. Under the plain error standard of review, we have held such adoption to be sufficient evidence that the district court did consider a defendant's financial resources in ordering restitution under the pre-amendment VWPA. See United States v. Greer, 137 F.3d 247, 252 (5th Cir.), cert. denied, ___ U.S. ___, 118 S. Ct. 2305 (1998). We find no plain error in the district court's orders of restitution.

## VIII.    CONCLUSION

For the reasons assigned, the convictions and sentences of defendants Richards, Braugh, and Latrasse are AFFIRMED.