United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 11, 2003**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 01-31099 consolidated with No. 01-31101

_____


UNITED STATES OF AMERICA

                              Plaintiff - Appellee


                    v.


                    KENNETH RICHMOND

                              Defendant - Appellant


_____


_____

consolidated with No. 02-30236

_____


UNITED STATES OF AMERICA

                              Plaintiff - Appellee
                    v.

     KENNETH RICHMOND; ARMSTEAD L.  KIEFFER

                         Defendants -Appellants

_____

      Appeals from the United States District Court
   For the Eastern District of Louisiana, New Orleans

_____



Before DAVIS, HALL[*] and EMILIO M. GARZA, Circuit Judges.

_____

     [*]    Circuit Judge of the United States Court of Appeals for
the Ninth Circuit, sitting by designation.

W. EUGENE DAVIS, Circuit Judge:**

                              I.

Appellants, Kenneth Richmond and Armstead Kieffer raise a number of issues in their challenge of their convictions and sentences relating to a mail theft scheme.  Richmond also appeals his two sentences for violations of supervised release imposed for earlier convictions.  For the reasons that follow, we affirm Richmond and Kieffer's convictions and sentences for the current offenses.  We vacate Richmond's sentences for violations of his supervised release imposed as part of his sentence on an earlier conviction and remand for re-sentencing consistent with this opinion.

                              II.

In 1999, while serving the last few months of an earlier sentence in a halfway house, Richmond recruited Postal Service Employee Yvette Jones to steal mail from the United States Post Office on Loyola Avenue in New Orleans.  Jones testified that she regularly hid mail in her lunch pail beginning in early 2000.  The stolen mail included personal checks, Treasury checks, and credit card bills.  Jones testified that she delivered mail to Richmond two to three times a week over an eight or nine month period in return for payment.  She delivered the mail to Richmond

---

**Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

either at a designated place outside the post office, at his liquor store, or at his home.

Richmond used the stolen mail to counterfeit Louisiana driver's licenses. Honey Marie Carey ("Carey"), a member of Richmond's "inner circle," testified that she sorted the stolen mail and telephoned banks and credit card companies to verify balances. Carey further testified that she made fake credit cards with an embossing machine using the credit card statement information and blank credit cards supplied by Richmond.

Richmond recruited, trained and paid a number of "runners" to negotiate the forged checks, using counterfeit identification bearing their likenesses, and to obtain cash advances or make actual purchases using the stolen credit cards. These runners reported to work regularly, adhered to a prescribed dress code, and were assigned pre-bundled packages of checks and fake licenses two to three times a week to obtain cash and return it to Richmond. The runners used Richmond's fleet of fraudulently leased vehicles to travel the state cashing the checks. Richmond paid one-third of the profits of his operation to Jones and one-third of the profits to the runners.

Kieffer cashed several stolen checks as a part of Richmond's scheme. Kieffer admitted to cashing five stolen personal checks on July 11 and 12, 2000, in a combined amount of $12,100.00. Kieffer also admits to cashing several other checks around this

time for which he was not indicted.  At trial, Carey and another co-conspirator testified  that Kieffer traveled to Texas with Richmond to target check-cashing machines, and while there went on a shopping spree with other members of the conspiracy using a counterfeit credit card.

Postal Inspectors eventually suspected Jones was stealing mail.  On September 29, 2000, Postal Inspectors observed Jones placing mail in her lunch pail, leaving the Post Office, getting into her car and exiting the parking garage.  Postal Inspectors stopped Jones and she consented to a search.  Her lunch pail contained 161 Treasury checks and 124 credit card statements.  Jones implicated Richmond during interrogation and explained that she was planning to deliver the mail to Richmond's liquor store.

At the request of the Postal Inspectors, Jones telephoned Richmond and asked him to meet her outside the Post Office to pick up the mail.  Richmond arrived and parked outside the Post Office in the designated spot.  Another co-conspirator accompanied Richmond in the front seat, and Kieffer rode in the back seat.  Jones entered the car and left the lunch pail on the seat next to Kieffer.  Postal Inspectors taped Jones's telephone conversation and videotaped the encounter with Richmond.  All three men were arrested.

Prior to trial, Richmond filed a motion to exclude evidence of his past convictions under Fed. R. Evid. 403(b).  The district

-4-

court denied the motion and allowed the government to introduce Richmond's two prior convictions to show knowledge and intent.

Appellants were charged with various offenses related to this scheme which included charges for conspiracy to possess stolen mail and commit bank fraud, attempted possession of stolen mail, possession of identification documents for an unlawful purpose and possession of counterfeit access devices. A jury convicted both defendants on all counts.

Before Richmond was sentenced, the government provided Richmond with a letter written by Carey, a key government witness at trial. Carey wrote to a friend that she had lied on the stand. Richmond moved for a new trial based on the letter, and the district court denied the motion without an evidentiary hearing. The district court sentenced Richmond in February 2002, and departed upward from the 110-137 month Sentencing Guideline range to impose a 240-month term of imprisonment.

The district court sentenced Kieffer to 72 months' imprisonment. This sentence reflects an upward departure from the 24 to 30 month Sentencing Guideline range.

At the time of his arrest, Richmond had two prior convictions involving identity theft. In 1997, Richmond pled guilty to possession of counterfeit securities, and the district court sentenced him to thirty months' imprisonment to be followed by three years of supervised release. In 1998, the district

court sentenced Richmond to thirty-five months' imprisonment and three years of supervised release after he pled guilty to possession and transfer of false identification documents and possession of forged securities.  The district court ordered Richmond to serve these sentences concurrently.

In August, 2001, the government filed a rule to show cause why these two terms of supervised release should not be revoked. The charges in the current case formed the basis of the government's motion.  The district court held a consolidated hearing and revoked the terms of Richmond's supervised release. Richmond received consecutive sentences of 24 months' imprisonment to be followed by one year of supervised release in each case to run concurrently.  The district court ordered the two 24-month terms to run consecutively to his new 240-month sentence.  We consider appellants' arguments below.

### III.

Richmond argues first that the district court erred in denying his motion for a new trial without conducting an evidentiary hearing. Following Richmond's conviction, the government intercepted a letter from an incarcerated co-defendant, Carey, in which she admitted to lying on the stand at Richmond's trial.[1]  Richmond filed his motion for a new trial

---

[1]     Carey'S letter reads in part:

I testified on Tuesday.  I know I f***ed up
the government's case.  I LIED my ass off on

-6-

based on Carey's recantation.

We review a district court's denial of a motion for new trial for abuse of discretion. United States v. Metz, 652 F.2d 478, 479 (5th Cir. 1981). We also review a district court's decision to rule on a motion for new trial without an evidentiary hearing for abuse of discretion. See United States v. Blackburn, 9 F.3d 353, 358 (5th Cir. 1993).

Richmond did not request an evidentiary hearing. Additionally, Richmond did not argue to the district court that the meaning of Carey's letter was unclear. In fact, he argues for the first time on appeal that an evidentiary hearing was necessary to determine the exact nature and extent of Carey's admitted perjury. Thus, Richmond waived his argument that an evidentiary hearing was necessary by not presenting it to the district court.

A new trial may be granted on defendant's motion "if the interests of justice so require." Fed. R. Crim. P. 33. However, a new trial is warranted "only where there would be a miscarriage of justice or where the evidence preponderates against the verdict." United States v. O'Keefe, 128 F.3d 885, 898 (5th Cir. 1997) (internal quotations and citations omitted). To obtain a new trial based on newly discovered evidence, a defendant must show:

_____

the stand.

> (1) that the evidence was newly discovered
> and unknown to the defendant at the time of
> trial, (2) that his failure to discover the
> evidence was not the result of a lack of due
> diligence, (3) the evidence is material and
> not merely cumulative or impeaching, and (4)
> the evidence will probably produce an
> acquittal.

United States v. Mulderig, 120 F.3d 534, 545 (5th Cir. 1997).

The district court denied the motion for new trial because

Richmond did not demonstrate that the alleged admissions in

Carey's letter "would probably produce an acquittal."  Further,

the court found that Carey's statements were exculpatory and that

evidence other than Carey's testimony strongly supported the

verdict.[2]

Richmond contends that he would not have been convicted of

possession of fifteen or more counterfeit or unauthorized access

devices in violation of 18 U.S.C. § 1029(a)(3) without Carey's

perjured testimony at trial.  Carey was the only government

---

[2]    It is also significant that Carey's letter makes it clear
that she lied to <u>help</u> Richmond, not hurt him.  Carey explained:

> I took total responsibility for everything
> between July and September.  I told them I
> made everything, everything was at my house,
> etc. (I've never made a D in my life)[sic] I
> knew the bulk of the case was built around the
> events that took place between 7/00 & 9/00.
> [sic] and them trying to put it all off on
> him.  Maybe now he'll have a ½ way decent
> chance at giving back some of the charges.  If
> not, he'll definitely have a good chance with
> his appeal. I couldn't just get up there and
> just let shit happen like that.

witness to testify that Richmond possessed fifteen or more counterfeit credit cards at one time. At trial, the government questioned Carey regarding the number and type of blank credit cards Richmond possessed for counterfeiting purposes. Carey stated, "The most I've ever seen at one time were like 25 of each, so maybe 100, altogether." Other witnesses testified that they saw Richmond in possession of counterfeit credit cards at different times, but no other witness testified that Richmond possessed more than fifteen cards at one time. Richmond argues if Carey's testimony is properly disregarded, the government failed to offer sufficient evidence to support his conviction on this count because § 1029(a)(3) does not allow aggregation of access devices possessed at different times to meet the requisite fifteen-card threshold.

Richmond relies on the Eighth Circuit's holding in United States v. Russell, 908 F.2d 405 (8th Cir. 1990), that access devices may not be aggregated for purposes of § 1029(a)(3). However, the next year the Eighth Circuit held in Unites States v. Farkas, 935 F.2d 962 (8th Cir. 1991), that access devices may be aggregated to satisfy the fifteen-card threshold of § 1029(a)(3) based on evidence that the defendant possessed different cards on different occasions as part of an ongoing scheme. The Eighth Circuit distinguished its earlier decision in Russell because the record contained evidence that Russell sold

his counterfeited credit cards as he made them and never possessed more than twelve at a time.  The defendant in Farkas did not sell the cards or dispose of them after he used them to make purchases.  Thus, the court held that it was appropriate to aggregate the total number of access devices because Farkas could not claim that his possession of the cards ended at any specific point. Id. at 967.  We agree with this reasoning.

Richmond's case is similar to that of the defendant in Farkas.  The record contains no evidence to suggest that Richmond sold the counterfeit cards or disposed of them in any other way.  Therefore, we agree that the government was not required to present a witness to testify that Richmond possessed fifteen or more cards on a single occasion, and the district court properly determined that the access devices in this case could be aggregated.  In addition to the testimony by several witnesses that Richmond possessed counterfeit credit cards at various times, Jones delivered to Richmond 126 credit card statements which were in his possession at the time of his arrest.  Under 18 U.S.C. § 1029(e)(1), credit card account numbers are included in the definition of "access devices."  Because Richmond cannot show that he would probably have been acquitted on this charge without Carey's testimony, the district court did not abuse its discretion in denying his motion for a new trial.

IV.

Richmond argues next that the district court erred in admitting evidence of his two prior criminal convictions at his trial. "The district court's decision to admit Rule 404(b) evidence is reviewed for abuse of discretion. This review is necessarily heightened in criminal cases." United States v. Peterson, 244 F.3d 385, 392 (5th Cir. 2001) citing United States v. Richards, 204 F.3d 177, 199 (5th Cir. 2000).

Federal Rule of Evidence 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

In United States v. Beechum, 582 F.2d 898 (5th Cir. 1978) (en banc), this circuit established a two-prong test for the admissibility of offenses extrinsic to a defendant's indictment to prove criminal intent:

> First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of rule 403.

-11-

Id. at 911.

Richmond contends that the district court erred in denying his motion to exclude evidence of his prior convictions without specifically articulating on the record why the court concluded that the probative value of the evidence outweighed its prejudicial effect. Richmond argues that this requires us to vacate his convictions and remand.

"Upon the request by a party, the district court determining the admissibility of 404(b) evidence must make an on-the-record articulation of its Beechum probative value/prejudice inquiry." United States v. Elwood, 993 F.2d 1146, 1153 (5th Cir. 1993). In the absence of such a request, a remand is not required "if the trial court expressly states that it has made the Beechum probative value/prejudice weighing and finds that prejudice does not substantially outweigh the probative value [and] there is nothing to indicate that the trial court misunderstood or misapplied the Beechum test." United States v. Olsum, 943 F.2d 1394, 1403 (5th Cir. 1991).

Richmond did not request that the trial court make its Beechum analysis on the record. The trial court clearly refers to the Beechum test in its Order and Reasons, and found that the probative value was strong enough to allow admission of the evidence. For the reasons below, we are satisfied that the trial court correctly applied the Beechum test.

Richmond argues that he did not place his intent at issue, and even if he did, the government had alternative evidence of his intent.  Richmond suggests that the government used the evidence in its opening statement to prove character propensity, and the trial court's limiting instructions could not cure the prejudice.

Every defendant on trial for conspiracy places his intent and knowledge at issue and justifies the introduction of extrinsic offense evidence unless the defendant "affirmatively take[s] the issue of intent out of the case." United States v. Mergist, 738 F.2d 645, 650 (5th Cir. 1984) (internal citations omitted).  This court stated: "Because of the unique nature of conspiracy charges, we cannot apply to them the policy suggested in Beechum of uniformly excluding extrinsic offense evidence when the defendant does not actively contest intent."  Id.  Every not guilty plea in a conspiracy case puts the defendant's intent at issue, and the only way the defendant can "affirmatively take the issue out of the case" is to stipulate that if his participation is proved, he does not contest intent. Id.  Richmond did not stipulate to knowledge, and Richmond's answers to defense counsel's questions apparently were aimed at proving he had no knowledge of the conspiracy.  Thus, Richmond's intent was at issue, and the district court did not err in admitting the evidence of his past convictions to show intent.

Richmond's recent prior convictions were similar to the charged offenses.  Richmond started each new scheme before completing his sentence for his previous conviction, and the schemes became more elaborate.  These earlier offenses have a tendency to show that Richmond had knowledge and intent to commit fraud in this case.  The trial court gave limiting instructions to the jury, during and after trial, explaining the limited purposes of the Rule 404(b) evidence.  The prosecutor emphasized the instructions at closing.  Although the evidence of his prior convictions was clearly prejudicial, the district court did not abuse its discretion in finding that their probative value outweighed the potential for prejudice.

V.

Kieffer argues that the evidence was insufficient to support his conviction for attempted mail theft in violation of 18 U.S.C. § 1708.  In reviewing sufficiency claims, we "must determine 'whether viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Williams, 264 F.3d 561, 576 (5th Cir. 2001) (citations omitted).  The "jury is 'free to choose among all reasonable constructions of the evidence,' and 'it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion

-14-

except that of guilt.'" Id. Our "review is limited to whether the jury's verdict was reasonable, not whether we believe it to be correct." Id.

To obtain a conviction under 18 U.S.C. § 1708, the government must prove beyond a reasonable doubt that (1) the defendant possessed the item described in the indictment, (2) the item had been stolen from the mail, (3) the defendant knew the item was stolen, and (4) the defendant had the specific intent to possess the item unlawfully. U.S. v. Osunegbu, 822 F.2d 472, 475 (5th Cir. 1987).

Mail theft was an object of the conspiracy. The jury was properly instructed on aiding and abetting and a co-conspirator's liability for substantive offenses committed by a co-conspirator in furtherance of the conspiracy. To find Kieffer guilty of aiding and abetting, the jury was required to find: (1) that the offense of attempted possession of stolen mail was committed by some person; (2) that the defendant associated with the criminal venture; (3) that the defendant purposefully participated in the criminal venture; and (4) that the defendant sought by action to make that venture successful. United States v. Garcia, 242 F.3d 593, 596 (5th Cir. 2001). Additionally, a conspirator is responsible for the offenses committed by other conspirators if he was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of, or as a

-15-

foreseeable consequence of, the conspiracy. <u>Pinkerton v. United States</u>, 328 U.S. 640 (1946).

Kieffer argues that he was merely present at the time Jones made the last delivery of mail to Richmond. Kieffer admits that he knew Richmond was receiving stolen mail from Jones. However, Kieffer argues that the evidence was insufficient to convict him on this count because "mere knowing presence" at the scene of criminal activity is insufficient to support a criminal conviction.

We are satisfied that the evidence was sufficient to allow the jury to convict Kieffer for attempted possession of stolen mail. Our review of the record reveals that there was clear evidence that Jones stole mail from the U.S. Post Office and delivered it to Richmond for use in his scheme. Jones testified that Kieffer accompanied Richmond to retrieve stolen mail from her on at least two occasions before the day of his arrest. In addition to Kieffer's presence at the scene on September 29, 2000, the government presented evidence of Kieffer's intentional involvement in the conspiracy. First, Kieffer admitted cashing stolen checks for Richmond in July of 2001 in various parts of Louisiana. Kieffer also admitted to possessing various counterfeit Louisiana driver's licenses which he used to cash the checks. The government also produced testimony from Carey that Kieffer came to her home to retrieve the laptop computer that the

conspirators used to make the counterfeit ID's. Two co-conspirators testified that Kieffer was involved in the attempt to cash checks in Texas using check-cashing machines, and one witness testified that Richmond and Kieffer shopped together using the counterfeit credit cards. A co-conspirator testified that Kieffer drove a black Expedition, and his family had a Lexus. Another co-conspirator testified that Richmond fraudulently leased six Ford vehicles, including the Expedition that Kieffer drove, from a dealership in Jackson, Mississippi. This evidence is sufficient to allow a jury to find that Kieffer actively participated in the conspiracy at the time Jones delivered the last bundle of stolen mail and that the jury was entitled to hold him accountable for the criminal conduct that furthered the aims of the conspiracy. Thus, we conclude that the evidence was sufficient to support Kieffer's conviction on this count.

## VI.

Both Kieffer and Richmond argue that the trial court's upward departure from the Sentencing Guidelines was improper. This court reviews an upward departure for an abuse of discretion. United States v. Winters, 174 F.3d 478, 482 (5th Cir. 1999); see also United States v. Ashburn, 38 F.3d 803, 807 (5th Cir. 1994) (en banc). "A district court has wide discretion in determining the extent of the departure, and [this court] will

affirm an upward departure if (1) the court gives acceptable reasons for departing and (2) the extent of the departure is reasonable. <u>United States v. Route</u>, 104 F.3d 59, 64 (5th Cir. 1997). The reasonableness of the extent of a departure is to be determined in light of the reasons for departure. <u>See</u> <u>United States v. Hawkins</u>, 87 F.3d 722, 730-31 (5th Cir. 1996).

A.

The district court departed upwardly from the Sentencing Guideline range of 24 to 30 months when it imposed a 72-month sentence on Kieffer. The district court based its departure on disruption to governmental function, losses uncaptured by the Guidelines and Kieffer's prior criminal record. Kieffer argues that his sentence must be vacated and his case remanded for re-sentencing because the district court failed to adequately explain the departure, the reasons offered cannot properly support the departure, and the extent of the departure was unreasonable. We disagree and affirm his sentence.

First, Kieffer argues that disruption to governmental function cannot support an upward departure in this case because the disruption is inherent in the offense.

United States Sentencing Guideline § 5K2.7 allows a district court to base an upward departure on disruption to governmental

function if the circumstances are unusual.[3]  In departing in this case, the district court explained that this court upheld an upward departure on the basis of disruption to governmental function in United States v. Garcia, 900 F.2d 45 (5th Cir. 1990), because of the amount of mail stolen, a total of 950 pieces.  The district court reasoned that although the amount of mail stolen in Garcia was greater in quantity, the "quality of the mail stolen by these Defendants in this case is an unusual circumstance that's not taken into account by the guidelines." The court pointed out that the mail stolen in this case included a large number of personal checks, Treasury checks and credit card statements.  The Treasury checks that were stolen had been issued by various federal agencies including the Internal Revenue Service, Social Security and the Veterans Administration.  As a

---

[3]  The Sentencing Guidelines provide:

> If the defendant's conduct resulted in a significant disruption of a governmental function, the court may increase the sentence above the authorized guideline range to reflect the nature and extent of the disruption and the importance of the governmental function affected.  Departure from the guidelines ordinarily would not be justified when the offense of conviction is an offense such as bribery or obstruction of justice; in such cases interference with governmental function is inherent in the offense, and unless the circumstances are unusual the guidelines will reflect the appropriate punishment for such interference.

U.S.S.G. § 5K2.7 (2001).

result of the thefts, these agencies had to contact beneficiaries and reissue checks. The district court did not abuse its discretion in concluding that the theft of these items caused substantial disruption in governmental function to these agencies.

Second, Kieffer argues that the district court improperly based its upward departure on losses uncaptured by the Guidelines. Kieffer argues that he cashed a discreet number of personal checks in mid-July, and should not be held accountable for losses that occurred as a result of the entire conspiracy.

The district court specifically rejected Kieffer's claim that he should only be held responsible for the stolen checks he cashed in July, a total of $25,000. The district court pointed to the value of the stolen mail retrieved when Kieffer and Richmond were arrested, approximately $300,000, and the sophistication of the scheme as a whole in deciding that the actual losses were uncaptured by the Guidelines. Kieffer's argument that he should not be held responsible for the losses related to the conspiracy fails for the same reason his sufficiency of the evidence claim fails.

Third, Kieffer argues that the district court's departure based on U.S.S.G. § 4A1.3 (2002) was improper. Kieffer contends that the district court gave his criminal history undue and unexplained weight. A district court may depart from an

otherwise applicable guideline range "when the criminal history category significantly under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes." U.S.S.G. § 4A1.3, p.s.

In United States v. Lambert, 984 F.2d 658, 663 (5th Cir. 1993) (en banc), this court rejected the notion that a district court, when departing on the basis of § 4A1.3, must "go through a ritualistic exercise in which it mechanically discusses each criminal history category it rejects en route to the category that it selects."

At the sentencing hearing, the district court specifically addressed the circumstances under which an upward departure is allowed based on the inadequacy of the defendant's criminal history category under USSG § 4A1.3 (2002). A sentencing court may upwardly depart from the Guideline range "if reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." Id. Noting that a prior arrest record, by itself, does not warrant a departure, the court in considering the totality of the evidence pointed to Kieffer's fifteen prior arrests in determining that Kieffer was a serious career recidivist. Consideration of Kieffer's past criminal history resulted in zero points being added to his base offense category

of I because the convictions were outside the time frame for consideration under the Guidelines. Kieffer had three juvenile convictions for simple robbery, simple burglary, armed robbery and possession of stolen property. Kieffer also had a conviction for simple battery as an adult. Although Kieffer has not been arrested as an adult for any other fraud-based crime, he has been repeatedly arrested for fighting and drug crimes. The district court did not err in departing on this ground.

Lastly, Kieffer argues that the extent of the departure is unreasonable. The district court has wide discretion in determining the extent of departure. Hawkins, 87 F.3d 730-31. The reviewing court generally defers to the sentencing court in making this determination. United States v. Lara, 975 F.2d 1120, 1125 n.3 (5th Cir. 1992). After hearing all of the evidence in a case and observing the defendants and the witnesses, the trial court has a much better feel for the case than we can ever get from the cold record. We have upheld departures of greater magnitude than that assessed to Kieffer. See United States v. Daughenbaugh, 49 F.3d 171, 174-75 (5th Cir. 1995) (upholding a departure from a range of 57 to 71 months to 240 months); United States v. Ashburn, 38 F.3d 803, 809 (5th Cir. 1994)(en banc)(upholding an increase from a range of 63 to 78 months to 180 months). Thus, the district court did not abuse its discretion in departing upwardly from the Sentencing Guideline

-22-

Range to impose upon Kieffer a sentence of 72 months.

B.

In sentencing Richmond, the district court imposed a 240-month prison sentence which reflected an upward departure from the guideline range of 110 to 137 months. The district court based its upward departure on disruption of governmental function and the inadequacy of Richmond's criminal history category.

Richmond objects to the upward departure based on disruption to governmental function for the same reasons Kieffer objected. The district judge adopted the reasons for the departure given during Kieffer's sentencing, which occurred as part of the same proceeding. For the reasons given above, the district court did not abuse its discretion by departing on this basis.

Richmond also argues that the district court abused its discretion in increasing his sentence based on his past criminal history. As noted by the district court, Richmond has a history of arrests and convictions for two earlier mail fraud schemes similar to the instant case. Richmond continued to commit the same type of offenses, despite arrests and prosecution. In fact, Richmond began each new scheme before he completed his sentence for the prior conviction. Additionally, Richmond had sixteen prior arrests for various offenses. A criminal history category of VI requires 13 or more criminal history points. Richmond's Presentence Investigation Report assigned him 17 criminal history

points.  No abuse of discretion has been shown.

                              VII.

Richmond argues last that his sentence for violation of
supervised release must be vacated and remanded for re-sentencing
because the district court did not allow him the opportunity to
allocute.  Additionally, Richmond contends that the imposition of
the two one-year periods of supervised release in addition to
prison time violates 18 U.S.C. § 3583(e)(3) and must be vacated.
We agree and vacate Richmond's sentences and remand for re-
sentencing with instructions to the district court to allow
Richmond to allocute prior to sentencing.

Because there are no applicable guidelines for sentencing
after revocation of supervised release, this court upholds a
defendant's sentence unless it is in violation of law or plainly
unreasonable. see U.S.S.G. Chapter 7 Part A 1 ("At this time, the
Commission has chosen to promulgate policy statements only.");
United States v. Headrick, 963 F.2d 777, 779 (5th Cir. 1992). "A
sentence is imposed in an illegal manner if the court fails to
comply with the procedural rules in imposing sentences." United
States v. Velasquez, 748 F.2d 972, 974 (5th Cir.1984). "Once it
is found that the district court failed to comply with a
procedural rule of sentencing, a new sentencing hearing should be
ordered." Id.

The court is required by Federal Rule of Criminal Procedure

-24-

32(c)(3)(C) to personally address the defendant, inquiring whether the defendant wishes to speak for himself.[4]  A district court's failure to comply with Rule 32(c)(3)(C) is not subject to the harmless or plain error provision of Fed. R. Crim. P. 52. United States v. Dabeit, 231 F.3d 979, 981 (5th Cir. 2000).  This court reviews whether the district court complied with this Rule de novo.  Id.

We have consistently held that a sentencing court's failure to ask whether a defendant wishes to speak in his own behalf requires automatic reversal.  See Dabeit, 231 F.3d at 981.  We have applied this rule to sentencing after revocation of supervised release. United States v. Rodriquez, 23 F.3d 919 (5th Cir. 1994).  Although the district court gave Richmond the opportunity to explain what he would have said at allocution during sentencing for his most recent conviction,  this was not enough. See United States v. Dominguez-Hernandez, 934 F.2d 598, 599 (5th Cir. 1991) (vacating sentence and remanding for re-sentencing for failure of court to allow defendant to allocute prior to sentencing).

---

[4]    Fed. R. Crim. P. 32 (c)(3) states:

> Before imposing a sentence, the court must:
> C:    address the defendant personally and determine whether the defendant wishes to make a statement and to present any information in mitigation of the sentence

Upon revocation of Richmond's supervised release, the district court sentenced him to two consecutive 24-month terms of imprisonment followed by one year of supervised release in each case.  Richmond argues that the two 24-month sentences were the maximum permitted by 18 U.S.C. § 3583(e)(3), and this court must vacate the one year terms of supervised release.  This court reviews issues of statutory construction de novo.  See Kemp v. G. D. Searle & Co., 103 F.3d 405, 407 (5th Cir. 1997).

Both of Richmond's earlier convictions were for Class C felonies that carried a maximum term of imprisonment of more than ten years but less than 25 years.   The maximum sentence of imprisonment authorized under 18 U.S.C. § 3583(e)(3) following revocation of supervised release is two years in each case.  18 U.S.C. § 3583(h) addresses imposition of supervised release following revocation.  It provides:

> When a term of supervised release is revoked and the defendant is required to serve a term of imprisonment that is less than the maximum term of imprisonment authorized under subsection (e)(3), the court may include a requirement that the defendant be placed on a term of supervised release after imprisonment.[5]

---

[5]   Section 3583(h) was recently amended to read:

When a term of supervised release is revoked and the defendant is required to serve a term of imprisonment, the court may include a requirement that the defendant be placed on a term of supervised release after imprisonment. The length of such a term of supervised

The district court imposed the maximum 24-month term of imprisonment on each count, so it was unauthorized to also impose a term of supervised release.

We vacate Richmond's sentences for violation of his terms of supervised release and remand to the district court for re-sentencing. The district court is instructed to allow Richmond an opportunity to allocute prior to sentencing.

## VIII.

For the foregoing reasons, we affirm Kieffer's conviction and sentence. We also affirm Richmond's conviction and sentence for the present offenses, and we vacate his two sentences for violation of supervised release imposed as part of his sentence on an earlier conviction and remand for re-sentencing in accordance with this opinion.

---

> release shall not exceed the term of supervised release authorized by statute for the offense that resulted in the original term of supervised release, less any term of imprisonment that was imposed upon revocation of supervised release.

18 U.S.C. § 3583(h) (2003).